951 A.2d 221 (2008)
401 N.J. Super. 392
G.H., Plaintiff-Respondent,
v.
TOWNSHIP OF GALLOWAY, Defendant-Appellant.
Township of Cherry Hill, Plaintiff-Appellant,
v.
James Barclay and Jeffrey Finguerra, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 2008.
Decided July 15, 2008.
*222 Demetrios K. Stratis, argued the cause for appellant in A-3235-06T1 (Law Offices of Demetrios K. Stratis, LLC and Stuart J. Roth (American Center for Law and *223 Justice) of the Washington, DC bar, admitted pro hac vice, attorneys; Mr. Stratis and Mr. Roth, of counsel and on the brief).
Frank L. Corrado, Wildwood, argued the cause for respondent in A-3235-06T1 (Barry, Corrado, Grassi & Gibson, P.C. and American Civil Liberties Union of New Jersey Foundation, attorneys; Mr. Corrado and Edward Barocas, on the brief).
Lynette Siragusa, argued the cause for amicus curiae Legal Services of New Jersey in A-3235-06T1 (Legal Services of New Jersey, attorneys; Ms. Siragusa, Ingrid D. Johnson and Melville D. Miller, Jr., of counsel and on the brief).
Ronald K. Chen, Public Advocate, for amicus curiae Department of the Public Advocate in A-3235-06T1 (Joan D. Van Pelt, Deputy Public Advocate, on the brief).
Loughlin & Latimer, for amicus curiae The New Jersey Chapter of the Association for the Treatment of Sexual Abusers in A-3235-06T1 (Stephen M. Latimer, on the brief).
Law Offices of Richard D. Pompelio, for amicus curiae New Jersey Crime Victims' Law Center in A-3235-06T1 (Richard D. Pompelio, of counsel and on the brief; Laura Nazzaro and Nicholas Pompelio, on the brief).
Yvonne Smith Segars, Public Defender, attorney for amicus curiae New Jersey Office of the Public Defender in A-3235-06T1 (Michael Z. Buncher, Deputy Public Defender, of counsel and on the brief).
Walter F. Kawalec, III, Cherry Hill, argued the cause for appellant in A-4036-06T1 (Marshall, Dennehey, Warner, Coleman & Goggin and Lisa M. Kmiec, New York City, attorneys; Mr. Kawalec, on the brief).
Scott T. Schweiger, argued the cause for respondents in A-4036-06T1.
Before Judges CUFF, LISA and SIMONELLI.
The opinion of the court was delivered by
LISA, J.A.D.
In these appeals,[1] we consider challenges to municipal ordinances prohibiting convicted sex offenders from living within a designated distance of schools, parks, playgrounds and daycare centers. The trial courts in both cases invalidated the ordinances, finding them preempted by state law and violative of the due process, ex post facto and double jeopardy clauses of the New Jersey Constitution. We affirm. We hold that the ordinances are preempted by state law and therefore invalid. Because we decide the appeals on preemption grounds, we do not address the constitutional issues.

I
The Galloway ordinance prohibits a person over the age of eighteen who has been convicted of a sexual offense against a minor as listed in N.J.S.A. 2C:7-2, and who is required to register with the authorities pursuant to Megan's Law, see N.J.S.A. 2C:7-1 to -19, from living within 2500 feet of any school, park, playground or daycare center in the Township. Upon notice from the Township, such a person must move within sixty days, or be subject to a fine of $1250 to $5000, imprisonment up to six months, and community service up to ninety days. The ordinance contains *224 a grandfather clause, exempting anyone who established a residence prior to the introduction date of the ordinance.
G.H., a twenty-year-old college freshman at Richard Stockton College, in Galloway Township, moved into a dormitory on campus after the effective date of the grandfather clause. G.H. had been adjudicated delinquent for an offense committed when he was fifteen years old, which, if committed by an adult, would constitute fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3b. The victim was a thirteen-year-old girl. G.H. was ordered to serve two years probation, which he had successfully completed. He had no other criminal history. G.H. was designated as a Tier 1 (low risk of reoffense) sex offender pursuant to Megan's Law. The Township sent him a notice advising that he was required to move within sixty days and could not live within 2500 feet of the campus (or, presumably in any other "buffer zone" in the Township).
G.H. brought a complaint in lieu of prerogative writs challenging the Galloway ordinance. No material facts were in dispute. After hearing oral argument on G.H.'s motion for summary judgment, Judge Valerie H. Armstrong issued a thorough written opinion declaring the ordinance invalid on the bases we have mentioned. Galloway Township filed this appeal.
The Cherry Hill ordinance is similar to that of Galloway Township. The only significant difference is in its penalty provisions. It designates each day of continuing violation a separate and distinct offense, and provides for a fine not to exceed $1250 per offense, together with imprisonment up to ninety days or community service up to ninety days.
James Barclay and Jeffrey Finguerra were convicted sex offenders[2] (CSO), over age eighteen, who moved into the Hillside Motel in Cherry Hill Township, which is located within 2500 feet of Camden Catholic High School. They moved after the effective date of the ordinance's grandfather clause. Each of the men was a recipient of Section 8 housing allowance from the State, and each moved into the motel after approval of the residence by his parole or probation officer. Each notified the Cherry Hill Township Police Department of the location of his residence. The men were notified by the Township they were in violation of the ordinance and were required to move within sixty days. They did not move because they were awaiting Section 8 housing and approval of a new residence by their parole or probation officers. After the passage of sixty days, the Township issued citations against them for violating the ordinance.
The matter came before the Township municipal court, which denied defendants' motions to dismiss on the grounds that the ordinance was invalid. The cases were then tried on stipulated facts. Defendants were found guilty, and sentenced to a fine of $50 plus $33 costs for each day beyond the sixty-day period after which they were notified. The municipal court suspended imposition of sentence on all but one of the charges for each defendant.
Defendants appealed to the Law Division. After hearing oral argument, the Law Division judge issued a written decision, in which he agreed with and substantially adopted Judge Armstrong's decision and invalidated the Cherry Hill *225 ordinance on the bases we have mentioned. Cherry Hill filed this appeal.

II
Although the two cases come to us by different procedural routes, they present the same issue. Indeed, the record informs us that more than 100 municipalities in New Jersey have recently adopted similar ordinances. The facilities designated in the Galloway and Cherry Hill ordinances are typical, but others are more expansive, including such additional facilities as school bus stops, libraries, convenience stores, sporting facilities, and the like. Most of the ordinances establish 2500 foot restrictions, but others designate different prohibited distances. And, some contain different penalties and other variations.
Galloway Township and Cherry Hill Township (the municipalities) argue[3] that the trial courts erred in finding their ordinances preempted by state law because the State has neither expressly nor impliedly occupied the field covered by the ordinances. Their argument rests upon the assertion that the applicable state law, Megan's Law, deals with registration and notification regarding CSOs, but does not include provisions restricting locations in which they live. Therefore, the municipalities argue that the ordinances serve a different purpose than Megan's Law and complement that law by providing additional measures for the safety of their inhabitants.
We do not agree with the municipalities' narrow characterization of the purpose of Megan's Law. The farreaching scope of Megan's Law and its multilayered enforcement and monitoring mechanisms constitute a comprehensive system chosen by the Legislature to protect society from the risk of reoffense by CSOs and to provide for their rehabilitation and reintegration into the community. The system is all-encompassing regarding the activities of CSOs living in the community. We conclude that the ordinances conflict with the expressed and implied intent of the Legislature to exclusively regulate this field, as a result of which the ordinances are preempted.

III
Municipalities are authorized by the Legislature to enact and enforce ordinances for specified enumerated purposes, N.J.S.A. 40:48-1, and, as long as not contrary to New Jersey or federal law, for any other purpose for the preservation of the health, safety and welfare of the municipality and its inhabitants. N.J.S.A. 40:48-2. And, laws concerning municipalities should be liberally construed in favor of local authority. N.J. Const. art. IV, § 7, ¶ 11.
However, while a municipality's powers are broad, they are not without limitations. Even without a direct conflict, a municipality may not exercise a power where the Legislature has clearly intended to preempt the field. Summer v. Twp. of Teaneck, 53 N.J. 548, 554, 251 A.2d 761 (1969). There is a limitation on the power of municipalities to enact ordinances on matters that are otherwise under their jurisdiction in situations where the State has preempted the field. State v. Crawley, 90 N.J. 241, 248, 447 A.2d 565 (1982). When the State reserves the right to legislate on a particular matter, municipalities are prohibited from legislating in that *226 area. Id. at 250, 447 A.2d 565. Legislative intent is critical to determining whether the State has exhausted a field, such that preemption occurs and municipal legislation is barred. Mack Paramus Co. v. Mayor & Council of Paramus, 103 N.J. 564, 573, 511 A.2d 1179 (1986).
In Overlook Terrace Management Corp. v. Rent Control Board of West New York, 71 N.J. 451, 461-62, 366 A.2d 321 (1976) (citations and internal quotation marks omitted), the Supreme Court set forth five factors to consider in determining whether the Legislature intended preemption:
1. Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?
2. Was the state law intended, expressly or impliedly, to be exclusive in the field?
3. Does the subject matter reflect a need for uniformity?. . . .
4. Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?
5. Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature?
Megan's Law is part of Title 2C, the Code of Criminal Justice. See N.J.S.A. 2C:1-1. In 1994, the Legislature enacted a package of bills pertaining to CSOs. Although only the Registration Act, L. 1994, c. 133 (codified at N.J.S.A. 2C:7-1 to -5), and the Community Notification Act, L. 1994, c. 128 (codified at N.J.S.A. 2C:7-6 to -11) were officially named "Megan's Law," see N.J.S.A. 2C:7-19, all of the bills comprising the package are commonly referred to collectively as Megan's Law. See Doe v. Poritz, 142 N.J. 1, 12, 662 A.2d 367 (1995). All of the laws were placed in Title 2C. See Cannel, New Jersey Criminal Code Annotated, comment on N.J.S.A. 2C:7-1. Of particular significance with respect to the issues in this case was the Community Supervision for Life statute, L. 1994, c. 130, § 2 (codified at N.J.S.A. 2C:43-6.4).[4] Since their original enactment, these laws have been amended from time to time, expanding the scope of the State's regulation of CSOs.
In Crawley, supra, 90 N.J. at 251, 447 A.2d 565, the Court stated that the Legislature intended to exclude from municipal legislation all areas covered by the criminal code. The Court cited the legislative history surrounding the enactment of the criminal code, which expressed the goal of promoting uniformity:
It shall be the purpose of [the Code of Criminal Justice] to modernize the criminal law of this State so as to embody principles representing the best in modern statutory law, to eliminate inconsistencies, ambiguities, outmoded and conflicting, overlapping and redundant provisions and to revise and codify the law in a logical, clear and concise manner.
[Id. at 250-51, 447 A.2d 565 (quoting L. 1968, c. 281 § 4).]
In Doe v. Poritz, supra, 142 N.J. at 12, 662 A.2d 367, the Court entertained a constitutional challenge to the registration and notification requirements of Megan's *227 Law. A CSO must undergo individualized assessment in order to determine his or her risk of reoffense. N.J.S.A. 2C:7-8. Based upon that assessment, the community is notified of the presence of the CSO. Ibid. Whenever a CSO moves to another residence, law enforcement must be notified, and, whether the move is within the same municipality or to a different one, the notification procedure is instituted again. N.J.S.A. 2C:7-2d(1) and -7; Doe v. Poritz, supra, 142 N.J. at 22, 662 A.2d 367.
In Doe v. Poritz, supra, 142 N.J. at 78, 662 A.2d 367, the contention was that these registration and notification requirements were too invasive and hampered the privacy rights of CSOs. The Court performed a lengthy analysis and determined that the rights of the community to protect the public from sex offenders who are likely to reoffend outweighed the privacy rights of CSOs. Id. at 88-91, 662 A.2d 367. The Court found that the propensity of sex offenders to reoffend was a major consideration in the adoption of Megan's Law. Id. at 14-20, 662 A.2d 367.
Depending on the degree of risk that the CSO will commit another offense, Megan's Law requires three different levels of notification to the community. N.J.S.A. 2C:7-8c. The Attorney General was charged with adopting guidelines for evaluating the risk of reoffense. N.J.S.A. 2C:7-8d. The county prosecutor where the individual resides assesses the CSO's risk of reoffense and assigns a tier rating. Ibid. The CSO may object to the assigned rating, at which point the court makes a determination. Doe v. Poritz, supra, 142 N.J. at 30, 662 A.2d 367. Even in default cases, where the CSO does not object to the proposed rating, the court is required to make specific findings in support of the tier classification and scope of notification. Megan's Law Bench Manual, 31-32 (Oct. 2004) (Bench Manual). All judicial determinations regarding tier classification and scope of notification, whether in a contested or default proceeding, must be by clear and convincing evidence. E.B. v. Verniero, 119 F.3d 1077, 1111 (3rd Cir. 1997). The Attorney General Guidelines provide for four categories to be considered in assigning the tier rating, including the seriousness of the offense, the offender's history, community support available, and characteristics of the CSO. Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws, Exhibit F (Registrant Risk Assessment Scale)[5] (Feb. 2007) (Guidelines).
Tier 1 offenders are considered low risk, and when they take up residence in a community, only local law enforcement needs to be notified. N.J.S.A. 2C:7-8c(1). A Tier 2 offender is considered moderate risk, and, in addition to local law enforcement, organizations including schools, churches and youth groups are notified when he or she moves into the community. N.J.S.A. 2C:7-8c(2). Tier 3 offenders are considered high risk and, therefore, upon such offender's moving into the community, any members of the public likely to encounter the CSO must be notified in addition to the notification required for tier 1 and tier 2. N.J.S.A. 2C:7-8c(3). The Guidelines set forth the process for notifying the community and limiting the dissemination of information to those who are intended to have it. Guidelines, supra, at 34-46. The Court found that the tier system ensured that notification requirements were only being imposed to the extent necessary, taking into consideration *228 the actual risk of reoffense of each CSO. Doe v. Poritz, supra, 142 N.J. at 25, 89, 662 A.2d 367.
In addition to these notification provisions, the Legislature has provided further measures for the protection of the public. In 2001, Megan's Law was amended to establish a Sex Offender Internet Registry. L. 2001, c. 167 (codified at N.J.S.A. 2C:7-12 to -19). Personal information, including a photograph and the street address where the CSO resides, must be available to the public on the internet for some CSOs. N.J.S.A. 2C:7-13g. The Legislature carefully selected criteria for determining which CSOs pose a sufficiently substantial risk to the community to warrant inclusion on the Sex Offender Internet Registry. See N.J.S.A. 2C:7-12.
Most CSOs are subject to community supervision for life, and remain in the custody of the Department of Corrections (DOC) unless the court grants a release based upon a demonstration that the person has been crime-free for fifteen years. N.J.S.A. 2C:43-6.4. Notably, N.J.S.A. 2C:43-6.4 does not require community supervision for life for individuals such as G.H., who are convicted of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3b. However, N.J.S.A. 2C:7-2b(2) does require such a person to register with local law enforcement if the victim was a minor.
Community supervision imposes sweeping restrictions on the lives of CSOs. DOC regulations confer upon supervising parole officers extensive authority over the daily lives of CSOs. A CSO must obtain permission from a parole officer prior to leaving the state; a CSO may not own or possess a firearm or other weapon, and must comply with curfews and submit to warrantless searches of a residence or vehicle; parole officers can require CSOs to undergo medical or psychological examinations, community or residential counseling, and drug and alcohol testing; parole officers must approve a CSO's employment, business or volunteer activities and change of employment, and must be notified promptly upon a CSO becoming unemployed; if the victim was a minor, the CSO may not have contact with minors and may not reside with any minor without prior approval of the parole officer; and, parole officers are empowered to impose additional "special conditions" deemed appropriate to reduce the likelihood of recurrence of the CSOs criminal behavior. N.J.A.C. 10A:71-6.11 and -6.12.
Very importantly with respect to the residency prohibition ordinances under review, CSOs may only live in a residence approved by their assigned parole officer, N.J.A.C. 10A:71-6.11(b)5 and -6.12(d)5, and may not move to a different residence without the permission of their parole officer. N.J.A.C. 10A:71-6.11(b)6 and -6.12(d)6.
CSOs are also required to notify the local police of their residence, to verify it at least annually, and give notification of any change of address. N.J.S.A. 2C:7-2d and e.
The Legislature understood that these restrictions represented a serious intrusion into the life of a CSO and therefore attempted to achieve a balance by providing the CSO with certain protections. Doe v. Poritz, supra, 142 N.J. at 12-14, 662 A.2d 367. The Court strongly admonished improper use of the information obtained through Megan's Law, and charged the Attorney General with investigating and, where appropriate, prosecuting for harassment or vigilantism. Id. at 84, 662 A.2d 367. Thus, N.J.S.A. 2C:7-16c prohibits using information obtained about a CSO pursuant to the notification requirements of Megan's Law to deny certain necessities, including "[h]ousing or accommodations." N.J.S.A. 2C:7-16c(7). We will later discuss *229 this in more detail. The Court emphasized that the goal is not to punish the CSO who has already served a sentence, but to protect society from the risk of reoffense. Doe v. Poritz, supra, 142 N.J. at 25, 73-74, 662 A.2d 367. The Court stressed the importance of the tier system as a means of distinguishing between individuals and protecting due process rights of CSOs. Id. at 28-40, 88-89, 99-109, 662 A.2d 367.

IV
Against this backdrop, the municipalities adopted these ordinances. Determination of whether the ordinances were preempted by state law requires consideration of the Overlook factors.
Our initial consideration is whether the ordinances conflict with state law, either because of conflicting policies or operational effect. Overlook, supra, 71 N.J. at 461, 366 A.2d 321. Stated differently, we must analyze whether the ordinances forbid what the Legislature has permitted or permit what the Legislature has forbidden.
Most CSOs are subject to community supervision for life, see N.J.S.A. 2C:43-6.4, which evinces a legislative intent to regulate the post-conviction lives of CSOs. We have mentioned the extensive DOC regulations that govern the supervision. Notably, the Legislature expressly provided that individuals required to serve a sentence of parole supervision for life shall remain in the custody of the Division of Parole and "shall be subject to conditions appropriate to protect the public and foster rehabilitation." N.J.S.A. 2C:43-6.4b (emphasis added). It is thus apparent that the Legislature, by express provision, intended a dual purpose in this aspect of the comprehensive scheme in dealing with CSOs.
Consonant with the goal of rehabilitation of CSOs and their reintegration into the community, parole officers must approve an appropriate residence for them when they complete their term of incarceration. N.J.A.C. 10A:71-6.11(b)5 and -6.12(d)5. An important consideration in selecting a residence is the support system that will be available to the CSO. Often, the best place for a CSO to live is in a household with responsible family members. It may also be at a halfway house or other appropriate facility, and it should be in reasonable proximity to treatment programs and employment, with available transportation resources. See Guidelines, supra, Exhibit F (specifying as criteria for risk assessment on the Registrant Risk Assessment Scale, "11. Therapeutic Support," "12. Residential Support," and "13. Employment/Educational Stability.").
The Cherry Hill ordinance prohibits CSOs from residing in virtually the entire township.[6] The Galloway ordinance bans CSOs from living in about two-thirds of Galloway Township.[7]
*230 The statutory and regulatory scheme, viewed in light of the exclusionary effect of the ordinances, provides strong evidence that the ordinances substantially interfere with the ability of parole officers to carry out their statutorily mandated function of finding the most appropriate housing for CSOs. In many cases, the most appropriate housing would be in a location prohibited by the residency restriction ordinances.[8]
The municipalities argue that the Legislature envisioned local law enforcement and parole officers working together for the benefit of the community. They contend that the ordinances allow police to patrol neighborhoods and determine whether a CSO is innocently taking a walk in a neighborhood where he or she lives, or is stalking young children. If the CSO does not live near a school or park, but is walking in the vicinity of one, the municipalities claim law enforcement will be in a better position to determine whether the CSO presents a danger. On the other hand, if the CSO lives in that neighborhood, it would be more difficult for the police to make this determination. The municipalities propose that, in this regard, local law enforcement can fill a gap that exists in the enforcement of Megan's Law. Thus, the municipalities argue that because the Legislature intended for local law enforcement to work together with parole officers in enforcing Megan's Law, the ordinances are not preempted by state law.
We find this argument unpersuasive. The ordinances prohibit where a CSO can live, but not where a CSO can walk or drive. Thus, a CSO is permitted to walk, sit or drive anywhere in these municipalities, regardless of where the CSO lives. As such, it is unclear how it will make law enforcement's job easier to know that a CSO does not reside in the neighborhood police are patrolling when it is perfectly lawful for the CSO to be found there in any event.
Further, the fact that local law enforcement is designated for enforcement of the notification requirements of Megan's Law does not confer a legislating power upon municipalities. We reject the municipalities' argument that the Legislature could not have expected local law enforcement to enforce the registration and notification provisions without also giving municipalities the power to legislate. This argument flies in the face of undisputed circumstance that although local law enforcement is called upon to enforce state criminal statutes, an enforcing municipality is not entitled as a result to legislate in the areas covered by those statutes.
The municipalities further argue that the buffer zones created by the ordinances take into consideration the same analysis that parole officers use in finding suitable housing, namely proximity to places that children frequent. They argue, therefore, that the buffer zone designations aid parole officers and do not conflict with the ability of parole officers to carry out their responsibility. We find this argument unavailing because the State empowers parole officers to find appropriate housing. N.J.A.C. 10A:71-6.11 and -6.12. There is no need for municipalities to supplement a parole officer's authority, and, as we *231 have said, the ordinances interfere with that authority.
We are further persuaded that the ordinances are specifically prohibited by the following Megan's Law provision:
a. Any information disclosed pursuant to this act may be used in any manner by any person or by any public, governmental or private entity, organization or official, or any agent thereof, for any lawful purpose consistent with the enhancement of public safety.
. . . .
c. Except as authorized under any other provision of law, use of any of the information disclosed pursuant to this act for the purpose of applying for, obtaining, or, denying any of the following, is prohibited:
(1) Health insurance;
(2) Insurance;
(3) Loans;
(4) Credit;
(5) Education, scholarships, or fellowships;
(6) Benefits, privileges, or services provided by any business establishment, unless for a purpose consistent with the enhancement of public safety; or
(7) Housing or accommodations.

[N.J.S.A. 2C:7-16 (emphasis added).]
Because the ordinances deny housing and accommodations to CSOs living in the municipalities, they are expressly preempted by N.J.S.A. 2C:7-16c(7). Statutes dealing with the same subject should be read in pari materia and construed so that, to the extent possible, each can be given its full effect. Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15, 878 A.2d 829 (2005). Statutory interpretations leading to absurd or unreasonable results are to be avoided. Davis v. Heil, 132 N.J.Super. 283, 293, 333 A.2d 537 (App. Div.), aff'd, 68 N.J. 423, 346 A.2d 405 (1975). Where two statutes appear to be in conflict, and one is general and the other specific, the conflict is resolved in favor of the more specific. State v. Gerald, 113 N.J. 40, 83, 549 A.2d 792 (1988); Kingsley v. Wes Outdoor Adver. Co., 55 N.J. 336, 339, 262 A.2d 193 (1970).
This statute sets forth a general rule in section a that information disclosed pursuant to Megan's Law may be used by any public, governmental or private entity for any lawful purpose. N.J.S.A. 2C:7-16a. In section c, the exception to this general rule prohibits use of the information to deny, among other things, housing or accommodations. N.J.S.A. 2C:7-16c(7). Thus, the general rule is that the information obtained through the notification requirements may be used to enhance public safety. The more specific rule is that information cannot be used to deny housing or accommodations. The municipalities seek to use Megan's Law information to deny CSOs housing in specific locations. In our view, this is a violation of N.J.S.A. 2C:7-16c(7).
The municipalities contend that N.J.S.A. 2C:7-16c(7) does not pertain to local governments, but is a prohibition against using the information in private real estate transactions. We reject this reading of the statute because the language "public, governmental, or private entity" expressly includes a municipality. The statute is not meant to be limited to private transactions.
The municipalities further argue that the term "housing" must be understood as it is defined in N.J.S.A. 10:5-5u of the Law Against Discrimination, N.J.S.A. 10:5-1 to -49(LAD).
"Housing accommodation" means any publicly assisted housing accommodation or any real property, or portion thereof, which is used or occupied, or is intended, arranged, or designed to be used or *232 occupied, as the home, residence or sleeping place of one or more persons. . . .
[N.J.S.A. 10:5-5u.]
The municipalities rely on this definition to argue that because the ordinances prohibit residence within a particular zone, as opposed to a specific home, N.J.S.A. 2C:7-16c(7) is not violated. We are unpersuaded. The LAD is not meant to be read in pari materia with Megan's Law because the two statutes address completely different subjects.
The municipalities also attempt to characterize the ordinances as zoning ordinances, which would bring them under the municipal power. See N.J.S.A. 40:55D-62. In support of this contention, they cite Taxpayers Ass'n of Weymouth Township, Inc. v. Weymouth Township, 80 N.J. 6, 34, 364 A.2d 1016 (1976), cert. denied, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977), for the proposition that a land use ordinance by definition also restricts the land users and is therefore not inherently objectionable. They also cite City of Renton v. Playtime Theatres Inc., 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29, 37 (1986), in which the Court upheld a zoning ordinance which prohibited an adult theater from being within a geographical distance of a residential zone, school, park or church. The Court held that the ordinance did not ban adult theaters altogether, but only those which were in a certain geographical zone. Ibid. In the same vein, Amicus Legal Services cites Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 178-80, 336 A.2d 713, cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975), for the proposition that a zoning ordinance cannot zone certain categories of people out of the municipality. See also William M. Cox, New Jersey Zoning and Land Use Administration § 7-5.2c (2008) (cataloging cases declaring invalid zoning ordinances banning from single family residential zoning districts groups of unrelated persons).
We need not reach in this case the dubious proposition that CSOs can be barred from living in designated areas under the zoning power. The cases relied upon by the municipalities involved ordinances which were, in fact, zoning ordinances. Here, the procedures required for adopting a zoning ordinance were never followed. See N.J.S.A. 40:55D-64. Calling a municipal action "zoning" cannot create municipal power to act in a way otherwise prohibited by conflicting state legislation. Scheff v. Twp. of Maple Shade, 149 N.J.Super. 448, 457, 374 A.2d 43 (App.Div.), certif. denied, 75 N.J. 13, 379 A.2d 244 (1977). The residency restriction ordinances are plainly not zoning ordinances.
Another conflict between the ordinances and Megan's Law is occasioned by the fact that N.J.S.A. 2C:7-2f and N.J.S.A. 2C:43-6.4c permit the Superior Court to relieve a CSO from the registration and notification requirements and community supervision provisions of Megan's Law if he or she is crime-free for fifteen years, but the ordinances have no such termination clause and are therefore more restrictive than the state law. The applicable language in both ordinances is substantially as follows:
No person over the age of 18 who has been convicted of a violation of any crime against a minor as listed in N.J.S.A. 2C:7-2, and who as a result of said conviction is required to register with the proper authorities pursuant to N.J.S.A. 2C:7-1. . . . shall be permitted to reside or live within 2500 feet of any school. . . .
The municipalities urge an interpretation that the ordinances' requirements end once a CSO is no longer "required to register" according to Megan's Law, thus *233 obviating the need for a termination clause and avoiding any conflict with Megan's Law.
It is not clear from a plain reading of the ordinances that a CSO would be free of their requirements once he or she is no longer required to register. Although this deficiency could be cured by a clarifying amendment, in their present form, the ordinances prohibit what the Legislature permitted because of the absence of a clear termination clause.
Another conflict derives from this provision in the criminal code:
Notwithstanding any other provision of law, the local governmental units of this State may neither enact nor enforce any ordinance or other local law or regulation conflicting with, or preempted by, any provision of this code or with any policy of this State expressed by this code, whether that policy be expressed by inclusion of a provision in the code or by exclusion of that subject from the code.
[N.J.S.A. 2C:1-5d.]
Megan's Law is contained in the criminal code, and municipal legislation is preempted in any area that the criminal code sought to regulate. See Crawley, supra, 90 N.J. at 247-51, 447 A.2d 565.
The municipalities argue that the Legislature's placement of Megan's Law in the criminal code is inconsequential because Megan's Law is not a criminal statute. They correctly point out that in Doe v. Poritz, supra, 142 N.J. at 73-74, 662 A.2d 367, the Court specifically referred to it as remedial and not criminal. Amicus New Jersey Office of the Public Defender, however, correctly notes that some of Megan's Law's provisions are criminal or have penal consequences. See, e.g., N.J.S.A. 2C:7-2a(3) (making failure to register a third-degree crime); N.J.S.A. 2C:43-6.4d (making violation of a condition of community supervision for life a fourth-degree crime with a presumption of imprisonment); N.J.S.A. 2C:43-6.4e (exposing a person who commits certain crimes while under community supervision for life to a mandatory extended term, which must be served in it entirety).
These distinctions are not dispositive of the issue before us. N.J.S.A. 2C:1-5d states that if any "policy" or "provision" is "expressed by" the criminal code, municipalities may not enact conflicting local laws. Thus, there is no need to determine whether that policy or provision is criminal or remedial. In either case, its placement in the criminal code brings it within the orbit of N.J.S.A. 2C:1-5d.
We next consider whether Megan's Law was intended, expressly or impliedly, to be exclusive in the field. Overlook, supra, 71 N.J. at 461, 366 A.2d 321. In Doe v. Poritz, supra, 142 N.J. at 25, 662 A.2d 367, the Court said that "the system devised by the Legislature is appropriately designed to achieve the laws' purpose of protecting the public." In our view, the Legislature's enactment of comprehensive legislation, the development of Attorney General Guidelines, and the adoption of DOC regulations monitoring the post-conviction behavior of CSOs demonstrate the Legislature's intention to exclusively occupy the field.
The municipalities rely on Township of Chester v. Panicucci, 62 N.J. 94, 96-97, 299 A.2d 385 (1973), in which the Court considered the prohibition in N.J.S.A. 23:4-16 of discharging a firearm within 300 feet of a residence or 400 feet of a playground for purposes of hunting. A municipal ordinance carried a higher penalty and prohibited any discharge of a firearm within the same distance, whether or not for hunting. Ibid. The Court held that because the state statute was very limited in *234 its scope and the protection it provided, it did not purport to completely occupy the field and therefore did not preclude municipalities from imposing stricter regulations. Id. at 101-02, 299 A.2d 385. The Court further considered that local conditions varied with respect to the need for protection in this regard. Id. at 102, 299 A.2d 385. Thus, the apparent intent of the Legislature was to only set a minimum baseline regulation, with municipalities allowed to impose stricter restrictions in the interest of public safety. Ibid.
Likewise, in Kennedy v. City of Newark, 29 N.J. 178, 182, 148 A.2d 473 (1959), also relied on by the municipalities, a Newark ordinance required that all of its officers and employees reside in the city. The ordinance was challenged on the ground that a state statute specified that municipal officers (but not other employees) as well as members of fire and police departments must reside within the municipality they serve. Id. at 186, 148 A.2d 473. Because other employees were not specified in the state statute, and police and fire department personnel were, the contention was that the Legislature intended to preempt municipalities from imposing a residency requirement on those other employees. Ibid. The Court disagreed, finding no clear legislative intent to occupy the field and stating that the Legislature left it to municipal discretion to determine whether other employees were required to live in the city as well. Id. at 187, 148 A.2d 473. The municipalities argue that this case stands for the proposition that where the State has not explicitly acted, a municipality may legislate.
We view those cases as materially distinguishable from the case before us. In those cases, the Legislature's limited enactments were insufficient to establish a clear intent to occupy the field. In the case before us, however, the comprehensive system represented by Megan's Law, including the Attorney General Guidelines and the DOC regulations, evinces a clear desire on the part of the Legislature to occupy the field, to the exclusion of local regulation. It is well to reiterate that the "field" includes rehabilitation and reintegration of CSOs into the community as well as protection of the public, and the means chosen by the Legislature includes a comprehensive framework for controlling and supervising the lives of CSOs living in the community.
Our analysis also requires consideration of whether the subject matter reflects a need for uniformity. Overlook, supra, 71 N.J. at 461, 366 A.2d 321. In Summer v. Township of Teaneck, supra, 53 N.J. at 552-53, 251 A.2d 761 (quoting Wagner v. Mayor & Mun. Council of Newark, 24 N.J. 467, 478, 132 A.2d 794 (1957)), the Court distinguished between matters of local concern "`which may be determined to be necessary and proper for the good and welfare of local inhabitants'" that are appropriate for municipal legislation, as opposed to matters of statewide concern "`involving state policy'" or "`affairs of general public interest and applicability'" for which there is an inherent need for uniformity. As an example, the Court stated that each municipality could not legislate regarding wills or real property because
[t]he needs with respect to those matters do not vary locally in their nature or intensity. Municipal action would not be useful, and indeed diverse local decisions could be mischievous and even intolerable. Hence the municipality may not legislate upon an aspect of a subject "inherently in need of uniform treatment."
[Id. at 553, 251 A.2d 761 (citation omitted).]
*235 On the other hand, with regard to some circumstances there is real variation from one locale to another. In those situations, "[t]here is no inevitable need for a single statewide solution," and it would be preferable to allow municipalities to act, because they are closer to the scene and "better situated to devise an approach to their special problems." Ibid. The Court held that when a municipal solution is called for, it is because the problem is particular to the municipality and requires a local solution. Ibid. However, when the issue exists statewide, it requires a uniform response. Ibid.
The Megan's Law scheme includes a tier system that requires the State to treat offenders uniformly according to their risk of reoffense. Placement within a tier is accomplished on a uniform basis by use of the Registrant Risk Assessment Scale in the Attorney General Guidelines. Tier classification is subject to judicial review as is the manner and scope of community notification. Doe v. Poritz, supra, 142 N.J. at 30, 662 A.2d 367.
To better assure statewide consistency in the classification of CSOs based on their risk of reoffending and the appropriate means of notifying the community of their presence, the Supreme Court ordered that in each vicinage one judge will be designated to conduct all Megan's Law review hearings. Id. at 39, 662 A.2d 367. The Court also created a three-judge panel "to review all matters that have been concluded for the purpose of determining the extent of disparity of treatment, as well as to design a bench manual, if that seems desirable, to help guide all of the reviewing judges throughout the state in their determinations, all in accordance with this opinion." Ibid. The bench manual was prepared and is in use throughout the vicinages, setting uniform procedures and criteria for decision making. Bench Manual, supra.
The three-judge panel, designated the "Three-Judge Disposition Review Committee," in conjunction with the Administrative Office of the Courts (AOC), continues to monitor procedures utilized and results of dispositions. Id. at 74. The Megan's Law judges periodically meet as a statewide group, to exchange information to keep their practices consistent. The Supreme Court has designated one Megan's Law judge as the Statewide Judicial Megan's Law Coordinator, who presides over the statewide group and who, along with the Three-Judge Disposition Review Committee, periodically reports to the Supreme Court. From time to time, the Statewide Judicial Megan's Law Coordinator and the Three-Judge Disposition Review Committee issue directives or advisories to the designated Megan's Law judges throughout the state to address perceived disparities.
Each year, the AOC issues an annual report regarding implementation of Megan's Law as mandated by the Court. Doe v. Poritz, supra, 142 N.J. at 39, 662 A.2d 367. Finally, the Court continues to assign a special panel of appellate judges to hear all appeals from the classification and notification determinations by the Megan's Law judges. Bench Manual, supra, at 65.
It is thus manifest that the judiciary has joined the other branches of state government in the extraordinary efforts to devise and implement a comprehensive and uniform statewide system to deal with all aspects of CSOs living in the community.
In Doe v. Poritz, supra, 142 N.J. at 89, 662 A.2d 367, the Court assumed that CSOs would be integrated into communities, thus necessitating the tier system. The Legislature was concerned about community safety because there was an expectation *236 that CSOs would be living among the general population. Ibid. A necessary ingredient for a CSO not to reoffend is that he or she is employed and living in a supportive environment. Precluding this integration increases the chance of reoffense.
However, if municipalities are permitted to restrict the residency of CSOs to the point where they will have difficulty finding housing in a traditional neighborhood, the entire tier system would become obsolete and the chance of reoffense would increase. The residency restrictions imposed by the ordinances hamper a CSO's ability to be near family and employment, thus hindering reintegration into the community. These restrictions make it difficult for a CSO to find stable housing, which can cause loss of employment and financial distress, factors which inadvertently increase the chance of reoffense. By restricting all CSOs, without regard to tier, the ordinances substantially hinder the integration of CSOs into the community, and conflict with the goal of the Legislature in designing a comprehensive and uniform system for protecting communities throughout the state. Ibid.
The concern expressed in Summer, supra, 53 N.J. at 553, 251 A.2d 761, that local treatment of a statewide issue could be "mischievous," is borne out by the proliferation of residency restriction ordinances throughout the state. Municipalities in all regions of the state are creating a patchwork of regulations restricting residency of CSOs. More than 100 municipalities in all twenty-one counties in New Jersey have adopted various versions of these ordinances. This makes it impossible for a CSO to know with clarity where he or she may reside in the state, thus defeating the uniformity the Legislature designed.
Although demographics vary considerably from one municipality to another, we see nothing unique from one locale to another regarding the need to protect children from sexual predators. We note that municipalities that have adopted these ordinances include all demographic types, ranging from cities (e.g. Paterson, Jersey City and Camden) and other densely populated urban centers, to suburban communities, to rural areas. The resulting mischief is that municipalities are racing to exclude CSOs from their communities, banishing them to live elsewhere. As we have stated, the Galloway and Cherry Hill ordinances preclude CSOs from residing in most portions of those communities. That is a typical consequence in the municipalities that have adopted such ordinances. In some, the result is total exclusion or (as in Cherry Hill) near-total exclusion.
We know from experience with our drug laws, setting 1000 foot school zones, N.J.S.A. 2C:35-7, and 500 foot zones for public parks and housing facilities, N.J.S.A. 2C:35-7.1, that the majority of the overall land area (including uninhabitable portions such as the Newark airport, marshlands, etc.) of cities and other densely populated areas fall within the prohibited zones. See New Jersey Commission to Review Criminal Sentencing, Report on New Jersey's Drug Free Zone Crimes & Proposal For Reform (Dec. 2005). Expanding those zones to 2500 feet (and, in some ordinances, adding additional facilities) will substantially magnify the scope of coverage. See Mulligan v. Panther Valley Prop. Owners Ass'n, 337 N.J.Super. 293, 305-06, 766 A.2d 1186 (App.Div.2001) (declining because of an inadequate record to pass upon the validity of a homeowners association ban on residency by Tier 3 offenders, but expressing concern, if the practice were widespread, about the possibility of making "a large segment of the housing market unavailable to one category of individual and indeed perhaps to *237 approach the `ogre of vigilantism and harassment'" as described by the Court in Doe v. Poritz, supra, 142 N.J. at 110, 662 A.2d 367, and commenting that, although CSOs are not a protected group under the LAD "[i]t does not necessarily follow . . . that large segments of the State could entirely close their doors to such individuals, confining them to a narrow corridor and thus perhaps exposing those within that remaining corridor to a greater risk of harm than they might otherwise have had to confront.").
The need for protection of the public is the same in every municipality. Asserted varying local conditions cannot justify these ordinances as appropriately suited to local legislation. Presumably, wherever there is a school, daycare center, playground or park, the need for protection would be the same. However, this is a decision for the Legislature and not for each individual municipality. The fact that the Legislature refrained from enacting such a statewide restriction indicates a legislative belief that Megan's Law, the DOC regulations, and the Attorney General Guidelines already addressed the issue. See Doe v. Poritz, supra, 142 N.J. at 25, 89, 662 A.2d 367. Therefore, we reject the municipalities' contention that uniformity is impossible and each municipality should legislate according to its own needs.
We do not find it necessary to separately address the fourth and fifth Overlook factors, dealing respectively with whether the state scheme is so pervasive that it precludes coexistence of municipal regulation and whether the local enactment is an obstacle to the accomplishment of the full purposes and objectives of the Legislature. Overlook, supra, 71 N.J. at 461-62, 366 A.2d 321. In our discussion of the other factors we have described the comprehensiveness of the state scheme and ways in which the ordinances interfere with the legislative purpose of rehabilitating CSOs and reintegrating them into the community.
We conclude that all of the Overlook factors favor preemption. A comprehensive apparatus has been constructed to address, on a uniform and statewide basis, the underlying problem of dealing with CSOs who have completed serving their sentences and are released into the community. In varying degrees, these individuals have a likelihood of reoffending. Therefore, there is a need for protection of the public. At the same time, to minimize the risk of reoffending, there is a need to provide appropriate living accommodations for CSOs, with support systems provided by family members and others, reasonably proximate to employment, public transportation networks, and treatment programs, in order to provide stability for CSOs in these respects. The Legislature has chosen a system by which CSOs will be uniformly classified based upon their risk of reoffending, notification to the community will be tailored according to that risk, registration will be required to keep local law enforcement apprised at all times of the whereabouts of the CSOs, and parole officers will approve where CSOs may live and supervise their daily activities.
The executive branch plays a vital role in the system, through the Attorney General (responsible for promulgating the Guidelines and providing ongoing oversight of the county prosecutors and local law enforcement), the county prosecutors (who make the initial risk assessments and represent the State in court proceedings), and local law enforcement (which is notified of the CSOs' presence and whereabouts in the community and effectuates the required notification). The judicial branch also plays a vital role, which includes the assurance of uniform treatment of CSOs throughout the state.
*238 In Doe v. Poritz, supra, 142 N.J. at 109-10, 662 A.2d 367, the Court referred to the Megan's Law scheme as the Legislature's choice
to protect [society] from sexual predators by adopting the simple remedy of informing the public of their presence. That the remedy has a potentially severe effect arises from no fault of government, or of society, but rather from the nature of the remedy and the problem; it is an unavoidable consequence of the compelling necessity to design a remedy.
Noting the potential for ostracism and other adverse impact upon CSOs, the Court was nevertheless satisfied that
government has done all it can to confine that impact, allowing it only where clearly necessary to effect public safety, and if the Tier level selected and the methods of notification conform to the statute and its intent, as defined and limited herein, Tier Two and Tier Three public notification will be appropriately confined and applied only to those whose apparent future dangerousness requires it, and the statute will not only have survived constitutional attack, but in fact will operate as the Legislature intended.
[Id. at 110, 662 A.2d 367.]
These observations by the Court are relevant to our preemption analysis, by highlighting the magnitude of the problem and the careful, deliberate, and pervasive choices made by the Legislature to address it. The Legislature did not include residency restrictions in its chosen remedy, but did include a complex system of particularized case-by-case assessment of risk of reoffending with a corresponding tailored form and scope of notification, combined with close supervision as the means of protecting the public and providing for rehabilitation and reintegration of CSOs into the community.
We conclude that the residency restriction ordinances conflict with the policies and operational effect of the statewide scheme implemented by Megan's Law, which was intended, both expressly and impliedly, to be exclusive in the field. The subject matter reflects a need for statewide uniformity. The scheme chosen by the Legislature, refined by the judiciary, and firmly entrenched for more than a decade on a uniform statewide basis, is pervasive and comprehensive, thus precluding the coexistence of municipal regulation. The ordinances interfere with and frustrate the purposes and operation of the statewide scheme.
Affirmed.
NOTES
[1] These appeals were calendared back-to-back for argument, and we now consolidate them for purposes of this opinion.
[2] The case was tried in municipal court on stipulated facts, which did not reveal the specific nature of their sex offenses or their tier classifications. The trial court stated in its opinion that the two defendants are classified as Tier 2 (moderate risk of reoffense) registrants under Megan's Law.
[3] Although the two townships filed separate briefs and did not make identical arguments, for purpose of this opinion we do not distinguish between the arguments of each, because we deem each township to have tacitly joined in the other's arguments.
[4] Although the title of N.J.S.A. 2C:43-6.4 remains "Community Supervision for Life," this section was amended in 2003, effective January 14, 2004, L. 2003, c. 267, § 1, to clarify that "parole supervision" for life is required under auspices of the State Parole Board, and the operative provisions in the section so state. See Cannel, supra, comment on N.J.S.A. 2C:43-6.4.
[5] A separate Juvenile Risk Assessment Scale and accompanying manual have also been developed and are now in use.
[6] During argument in municipal court on the dismissal motion, counsel for the two Cherry Hill defendants said,

having looked at the map that was generated, there are approximately two small  and I mean small areas where these individuals would be allowed to reside within the Township of Cherry Hill. [One is an expensive development that defendants could not afford and the other is a desolate field. Therefore,] this ordinance, in whole, prohibits these individuals from living anywhere within the Township and I guess that's the design and that's the intent of the . . . Township in this regard.
When the judge asked the municipal prosecutor to respond, he evaded the question, contending it was irrelevant. He did not deny defense counsel's description of what the map depicted. The map was stipulated in evidence at the municipal court trial. We have not been furnished with a copy of the map.
[7] The Galloway Township engineer certified that "there is approximately 36.9% of livable land contained within the Township of Galloway for residential uses for those residents outside of the 2,500-foot buffer zone."
[8] Amici New Jersey Office of the Public Defender and Department of the Public Advocate have provided information documenting specific examples of CSOs whose residency arrangements, deemed optimal to provide needed support and stability, had to be changed because of residency restriction ordinances.