# SUPREME COURT OF THE UNITED STATES

ANGEL ORTIZ *v.* DENNIS BRESLIN, SUPERINTEN-
DENT, QUEENSBORO CORRECTIONAL
FACILITY, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE
COURT OF APPEALS OF NEW YORK

No. 20–7846.   Decided February 22, 2022

The petition for a writ of certiorari is denied.

Statement of JUSTICE SOTOMAYOR respecting the denial
of certiorari.

In New York, criminal defendants who earn sufficient
good time credits before the end of their prison sentences
are entitled to conditional release.  Defendants classified by
the State as "level three sex offenders," however, must first
assure the State that they will not reside within 1,000 feet
of any school.  In New York City, this is no easy task, and
the difficulties of finding a compliant residence can result
in defendants serving additional time in prison past the ex-
piration of their sentences.  Because petitioner Angel Ortiz
was unable to identify any release address that satisfied the
State's requirement, he spent over two additional years in-
carcerated when he should have been at liberty.  Although
Ortiz's petition does not satisfy this Court's criteria for
granting certiorari, I write to emphasize that New York's
residential prohibition, as applied to New York City, raises
serious constitutional concerns.

## I

Ortiz was sentenced in New York state court to 10 years
in prison and 5 years of postrelease supervision.  Near the
end of his prison term, Ortiz had earned good time credits
that entitled him to release to a term of community super-
vision.  As required by New York's Department of Correc-

tions and Community Supervision (DOCCS), Ortiz proposed that he would reside with his mother and his daughter in their New York City apartment. The DOCCS denied Ortiz's request, citing New York law that it interprets to prohibit a person designated as a "level three sex offender," like Ortiz, from residing within 1,000 feet of a school. See N. Y. Exec. Law Ann. §259–c(14); N. Y. Penal Law Ann. §220.00 (West Cum. Supp. 2022).[1] Ortiz then proposed dozens of other release addresses, including various homeless shelters, but DOCCS rejected each one. As a result, Ortiz spent the entirety of his 17 months of conditional release in prison.

Even after Ortiz served the full 10 years of his sentence, Ortiz's confinement did not end. Instead of releasing Ortiz, New York transferred him to a state prison that it designated a "Residential Treatment Facility" to begin serving his period of postrelease supervision. Ortiz spent eight months in two of these facilities, where he lived behind barbed wire, in a general prison population, in conditions nearly identical to those in which he served his sentence.[2] All told, because of New York's residency prohibition, Ortiz was imprisoned for over two years longer than he otherwise would have been.

While at a Residential Treatment Facility, Ortiz filed a petition for a writ of habeas corpus in state court, seeking release to any one of the New York City Department of

---

[1] The text of the relevant law provides that a covered "offender shall refrain from knowingly entering into or upon any school grounds." N. Y. Exec. Law Ann. §259–c(14). New York defines "[s]chool grounds" as "any area accessible to the public located within one thousand feet" of a school. N. Y. Penal Law Ann. §220.00. DOCCS interpreted this requirement to reject Ortiz's proposed release address because a childcare center was located in his family's apartment building.

[2] The principal difference between the treatment of Ortiz and the other residents serving sentences was that Ortiz was occasionally allowed to leave, guarded by armed correctional officers, to join a work crew that unloaded trucks at a nearby police facility.

Homeless Services shelters, or, failing that, to live un-housed on the street. The court denied the writ, reasoning that Ortiz had not located "compliant community housing," and thus, his continued detention was warranted. App. to Pet. for Cert. 91a. The intermediate appellate court affirmed, and, in a divided opinion, the New York Court of Appeals affirmed as well.

## II

In effect, New York's policy requires indefinite incarceration for some indigent people judged to be sex offenders. The within-1,000-feet-of-a-school ban makes residency for Ortiz and others practically impossible in New York City, where the city's density guarantees close proximity of schools. See *Gonzalez* v. *Annucci*, 32 N. Y. 3d 461, 470, 117 N. E. 3d 795, 800 (2018) (acknowledging the "dearth" of compliant housing in New York City). Rather than tailor its policy to the geography of New York City or provide shelter options for this group, New York has chosen to imprison people who cannot afford compliant housing past both their conditional release date and the expiration of their maximum sentences.

Judge Jenny Rivera's dissent below ably explains how New York's policies as applied to people like Ortiz raise constitutional concerns.[3] *People ex rel. Johnson* v. *Superintendent*, 36 N. Y. 3d 187, 207, 163 N. E. 3d 1041, 1056 (2020). Although individuals generally do not have a protected liberty interest in conditional release before expiration of their sentences, such an interest "may arise from an expectation or interest created by state laws or policies." *Wilkinson* v. *Austin*, 545 U. S. 209, 221 (2005); see also *Sandin* v. *Conner*, 515 U. S. 472, 483–484 (1995) ("States may under certain circumstances create liberty interests. . . protected by

———————
[3] Judge Rowan Wilson's dissent also importantly addresses how DOCCS's policy violates New York City's obligation to provide shelter to those in need. *Johnson*, 36 N. Y. 3d, at 231, 163 N. E. 3d, at 1072.

the Due Process Clause"). Here, New York law provides that a defendant "shall . . . be conditionally released" once he earns sufficient credits, as Ortiz did. N. Y. Penal Law Ann. §70.40 (West 2021). As a New York City resident, Ortiz also enjoyed a right to "shelter and board [for] each homeless man who applies for it." *Callahan* v. *Carey*, 307 App. Div. 2d 150, 151, 762 N. Y. S. 2d 349, 350 (2003). In my view, under these New York state and city policies, Ortiz may well have held a liberty interest at the point that he became entitled to conditional release. At the very least, however, Ortiz indisputably held a liberty interest in his release at the expiration of his full sentence.

The State's denial of Ortiz's liberty interest in his release demands heightened scrutiny. Even absent such scrutiny, however, as Judge Rivera explains, New York's policy of indefinite detention may not withstand even rational-basis review. *Johnson*, 36 N. Y. 3d, at 218–221, 163 N. E. 3d, at 1063–1065. No one doubts that New York's goal of preventing sexual violence toward children is legitimate and compelling, but New York nonetheless must advance that objective through rational means. Courts, law enforcement agencies, and scholars all have acknowledged that residency restrictions do not reduce recidivism and may actually increase the risk of reoffending. For example, in striking down retroactive application of Michigan's residency restriction, the Sixth Circuit found no evidence that "residential restrictions have any beneficial effect on recidivism rates." *Does #1–5* v. *Snyder*, 834 F. 3d 696, 705 (2016). The Superior Court of New Jersey, Appellate Division, struck down local ordinances establishing residential restrictions, concluding that they were pre-empted by state law. See *G. H.* v. *Galloway*, 401 N. J. Super. 392, 951 A. 2d 221 (2008), aff'd, 199 N. J. 135, 971 A. 2d 401 (2009). The court explained that the local ordinances "make it difficult for a [convicted sex offender] to find stable housing, which can cause loss of employment and financial distress, factors

which inadvertently increase the chance of reoffense." 401 N. J. Super., at 417, 951 A. 2d, at 236.

Law enforcement agencies also recognize that residency restrictions are often counterproductive. The Department of Justice acknowledges that there is "no empirical support for the effectiveness of residence restrictions" such as New York's. Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative 205 (2017). In fact, the Department notes, residency restrictions may cause "a number of negative unintended consequences" that "aggravate rather than mitigate offender risk." *Ibid.* An empirical study of recidivism conducted by the Minnesota Department of Corrections confirmed that "none of the 224 sex offenses would likely ha[ve] been deterred by a residency restriction law." G. Duwe, Residency Restrictions and Sex Offender Recidivism: Implications for Public Safety, 2 Geography & Pub. Safety 6, 7 (May 2009). Like the Department of Justice, the Minnesota Department of Corrections concluded that "[b]y making it more difficult for sex offenders to find suitable housing and successfully reintegrate into the community, residency restrictions may actually compromise public safety by fostering conditions that increase offenders' risk of reoffending." *Id.,* at 8.

A large body of scholarship also cautions against residency restrictions as a means of reducing recidivism. Criminologists considering data from Missouri and Michigan concluded that residency restrictions have little or no effect on recidivism. B. Huebner et al., The Effect and Implications of Sex Offender Residence Restrictions: Evidence From a Two-State Evaluation, 13 C. & Pub. Pol'y 139, 156 (2016). A similar study of recidivism rates in Florida reached the same conclusion. P. Zandbergen, J. Levenson, & T. Hart, Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism, 37 Crim. Justice & Behavior 482, 498 (2010) ("The results of this study indicate no empirical association between where a

sex offender lives and whether he reoffends sexually against a minor"). Other scholars have explained that by banishing returning individuals to the margins of society, residency restrictions may lead to homelessness, unemployment, isolation, and other conditions associated with an increased risk of recidivism. See generally A. Frankel, Pushed Out and Locked In: The Catch-22 for New York's Disabled, Homeless Sex-Offender Registrants, 129 Yale L. J. Forum 279 (2019).

Despite the empirical evidence, legislatures and agencies are often not receptive to the plight of people convicted of sex offenses and their struggles in returning to their communities. Nevertheless, the Constitution protects all people, and it prohibits the deprivation of liberty based solely on speculation and fear.

When the political branches fall short in protecting these guarantees, the courts must step in. Indeed, although a clear split has yet to develop among Federal Courts of Appeals or state courts of last resort, a growing number of courts have confronted issues cause by the extended imprisonment of people convicted of sex offenses. In Illinois, for instance, a Federal District Court enjoined the State from jailing people convicted of sex offenses "indefinitely because they are unable to find a residence due to indigence and lack of support." *Murphy* v. *Raoul*, 380 F. Supp. 3d 731, 738, 766 (ND Ill. 2019). The Court of Appeals of North Carolina held under state law that North Carolina could not revoke a person's probation simply because he could not find a residence that complied with the State's residency restriction. *State* v. *Talbert*, 221 N. C. App. 650, 727 S. E. 2d 908 (2012). In Wisconsin, after litigation challenged the State's policy of jailing people convicted of sex offenses past their mandatory release dates, Wisconsin voluntarily rescinded its policy requiring detention beyond the expiration of a sentence. See *Werner* v. *Wall*, 836 F. 3d 751, 757 (CA7 2016). Because of the grave importance of these issues and

the frequency with which they arise, it seems only a matter of time until this Court will come to address the question presented in this case.

*       *       *

New York should not wait for this Court to resolve the question whether a State can jail someone beyond their parole eligibility date, or even beyond their mandatory release date, solely because they cannot comply with a restrictive residency requirement. I hope that New York will choose to reevaluate its policy in a manner that gives due regard to the constitutional liberty interests of people like Ortiz.