# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 47
The People &c. ex rel. Danny
Rivera,
　　　Appellant,
　　　　v.
Superintendent, Woodbourne
Correctional Facility, et al.,
　　　Respondents.

Kerry Elgarten, for appellant.
Frank Brady, for respondents.

SINGAS, J.:

At issue in this case is whether the Sexual Assault Reform Act's (SARA) school

grounds condition, as codified in Executive Law § 259-c (14), violates the Ex Post Facto

Clause of the United States Constitution when applied to offenders whose crimes predated

the 2005 amendments to SARA.  We hold that petitioner has not met his burden to demonstrate, by the clearest proof, that it does.

I.

In 1986, petitioner was convicted of two counts of murder in the second degree, two counts of attempted murder in the second degree, and one count of rape in the first degree, stemming from an incident where petitioner, acting in concert with four co-offenders, shot four individuals, killing two and wounding two others.  Petitioner also raped one victim, a 25-year-old woman whom he later shot three times.  Petitioner was sentenced to an aggregate prison term of 20 years to life.  In April 2019, petitioner was granted an open parole release date of May 23, 2019.  At his Sex Offender Registration Act (SORA) hearing held prior to his anticipated release, petitioner was adjudicated a level three sexually violent offender.  The level three SORA designation, and the fact that petitioner is serving a sentence for an offense enumerated in Executive Law § 259-c (14), subjects petitioner to SARA's school grounds condition, which effectively prohibits him from living within 1,000 feet of a school, or "any other facility or institution primarily used for the care or treatment" of minors (Executive Law § 259-c [14]).  Petitioner was unable to locate SARA-compliant housing before his open release date.  Because petitioner did not satisfy the mandatory parole condition, he remained in custody until he could locate suitable housing.

In October 2020, petitioner filed a petition for a writ of habeas corpus, seeking immediate release on the grounds that SARA's residency restriction, enacted after petitioner committed his crimes, violated the Ex Post Facto Clause of the Federal Constitution as applied to him.  Supreme Court granted petitioner's application and held

that application of both SORA and SARA to petitioner violated the Ex Post Facto Clause because the effect of the residency restriction in prolonging petitioner's incarceration past his release date was punitive. The court ordered respondents, Woodbourne Correctional Facility Superintendent and the New York State Department of Corrections and Community Supervision (collectively "DOCCS"), to release petitioner to parole supervision and enjoined DOCCS from applying the school grounds condition to him. Petitioner remained incarcerated pursuant to stays of Supreme Court's judgment until March 2021, at which time SARA-compliant housing became available and he was released to parole supervision.

The Appellate Division unanimously reversed the judgment on the law (*see* 200 AD3d 1370 [3d Dept 2021]).[1] The Court held "that DOCCS's adherence to its statutory obligation of imposing SARA residency restrictions does not constitute a violation of the Ex Post Facto Clause" (*id.* at 1374-1375 [internal citation omitted]). Applying the Supreme Court's intent-effects test, the Court "acknowledge[d] that SARA's residency restriction 'constitute[s] affirmative restraint[ ], bear[s] some resemblance to historical criminal punishment, and serve[s] the goal of deterrence' " (*id.* at 1373). However, the Court concluded that the condition does not violate the Ex Post Facto Clause because it is both "rationally related to a conceivable, legitimate government purpose of keeping level three sex offenders more than 1,000 feet away from schools" (*id.* at 1374, quoting *People ex rel.*

---

[1] The Court also converted the petition to a declaratory judgment action, as petitioner was no longer in custody.

*Johnson v Superintendent, Adirondack Corr. Facility*, 36 NY3d 187, 203 [2020]) and " 'tailored to impose the greatest restrictions on the riskiest sex offenders' " (*id.*, quoting *Wallace v State of New York*, 40 F Supp 3d 278, 320 [ED NY 2014]).

We granted petitioner's motion for leave to appeal (*see* 38 NY3d 1029 [2022]).

II.

Originally enacted in 2000 as a provision of SARA, a statutory scheme designed "to better protect the public, and especially children, from sex offenders determined to pose the most risk" (*Matter of Alvarez v Annucci*, 38 NY3d 974, 976 [2022]), Executive Law § 259-c (14) imposed a mandatory condition prohibiting certain sex offenders from entering school grounds or other child-care facilities (*see* L 2000, ch 1, § 8). The condition originally applied only to those sex offenders whose crimes were committed against victims under 18 years old. In 2005, the legislature amended the provision and expanded the reach of this condition in two respects (L 2005, ch 544, § 2). First, the legislature adopted a broader definition of "school grounds," as set forth in Penal Law § 220.00 (14) (b), to include "any area accessible to the public located within [1,000] feet of" a school or child-care facility. Second, the legislature applied the school grounds condition to a second group of offenders: those designated "level three sex offenders serving a sentence for an enumerated offense" (*People ex rel. Negron v Superintendent, Woodbourne Corr. Facility*, 36 NY3d 32, 34 [2020]). Within these two categories of sex offenders, the condition applies only to those who are on parole, conditional release, or "subject to a period of postrelease supervision" (*Matter of Alvarez*, 38 NY3d at 976).

Though Executive Law § 259-c (14) is not a residency restriction by its explicit language, the "practical effect" of the condition "is that any sex offender who is subject to [it] is unable to reside within 1,000 feet of a school or facility as defined in Penal Law § 220.00 (14) (b)" (*People v Diack*, 24 NY3d 674, 682 [2015]). In practice, DOCCS requires subject offenders to secure SARA-compliant housing prior to, and as a condition of, their release. In the event these offenders are unable to find compliant housing prior to their expected release date, DOCCS will not release them. Rather, those who are set to begin supervised release are either transferred to residential treatment facilities (RTFs) (*see People ex rel. McCurdy v Warden, Westchester County Corr. Facility*, 36 NY3d 251, 254 [2020]), or remain in prison (*Johnson*, 36 NY3d at 193) depending on the terms of the individual offender's sentence. DOCCS will only release these offenders when they secure compliant housing.

Petitioner's argument focuses exclusively on the carceral effect of Executive Law § 259-c (14). While petitioner maintains that his claim challenges both SORA and SARA, petitioner does not assert that the effects of SORA, beyond its operation by which petitioner was adjudicated a level three offender subjecting him to SARA's school grounds condition, are punitive. As such, only Executive Law § 259-c (14) is at issue in this case.

III.

The United States Constitution's Ex Post Facto Clause prohibits states from "retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts" (*Collins v Youngblood*, 497 US 37, 43 [1990]). The ex post facto prohibition "applies only to penal statutes" and "where the challenged statute does not seek to impose a

punishment, it does not run afoul of the Ex Post Facto Clause" (*Kellogg v Travis*, 100 NY2d 407, 410 [2003]).

To determine whether a statute violates the Ex Post Facto Clause, courts apply the Supreme Court's intent-effects test (*see Smith v Doe*, 538 US 84, 92 [2003]). This two-pronged inquiry first considers whether the legislature intended the relevant statute to be punitive or civil in nature (*see id.*). If the legislature intended the statute to be punitive, its retroactive application to conduct that predates the statute violates the Ex Post Facto Clause (*see id.*). If not, a court must then consider whether the statute is " 'so punitive either in purpose or effect as to negate the . . . intention to deem it civil' " (*id.*, quoting *Kansas v Hendricks*, 521 US 346, 361 [1997]). The parties agree that SARA was not intended to be a punitive statutory scheme; indeed, this Court's precedent, as well as SARA's legislative history, confirms that the legislature enacted Executive Law § 259-c (14) to protect children from sex offenders, not to punish those offenders (*see Matter of Alvarez*, 38 NY3d at 976; *Johnson*, 36 NY3d at 203; Assembly Mem in Support, Bill Jacket, L 2005, ch 544 at 4). Thus, only the "effects" prong of the inquiry is at issue—that is, whether the effects of the school grounds condition are so punitive as to negate the legislature's intent to deem SARA a civil statutory scheme.

"Legislative enactments enjoy a strong presumption of constitutionality" (*LaValle v Hayden*, 98 NY2d 155, 161 [2002]). " '[O]nly the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty' " (*Smith*, 538 US at 92 [some internal quotation marks omitted], quoting *Hudson*

*v United States*, 522 US 93, 100 [1997]).  The clearest proof requirement is a "heavy burden" on the party challenging the statute (*Hendricks*, 521 US at 361).

Moreover, this Court may not consider an "as-applied" challenge to Executive Law § 259-c (14) (*see Seling v Young*, 531 US 250, 263 [2001]).  Because "[t]he civil nature of a [statutory] scheme cannot be altered based merely on vagaries in the implementation of the authorizing statute," an "as-applied" analysis "would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under" the Ex Post Facto Clause (*id.*).  Instead, we must assess the statute on its face and "consider the effects of [Executive Law § 259-c (14)] as they [a]re generally felt by those who a[re] subject to them" (*McGuire v Marshall*, 50 F4th 986, 1004 [11th Cir 2022]; *see also Smith*, 538 US at 99-100).

The United States Supreme Court has set forth several relevant factors that may serve as "useful guideposts" in considering whether the effects of a statute are so punitive as to render its retroactive application unconstitutional (*Hudson*, 522 US at 99).  Most relevant to our analysis are five such factors: (1) whether the condition constitutes an affirmative restraint, (2) whether the condition resembles historically criminal punishment, (3) whether the condition promotes the traditional aims of punishment, (4) whether the condition is rationally connected to a nonpunitive purpose, and (5) whether the condition is excessive in relation to that nonpunitive purpose (*Kennedy v Mendoza-Martinez*, 372 US 144, 168-169 [1963]; *see also Smith*, 538 US at 97).

Evaluating Executive Law § 259-c (14) within the intent-effects framework, the first three factors tend to weigh in petitioner's favor but are not themselves dispositive.  First,

the school grounds condition is an affirmative restraint to the extent that it prohibits

offenders from entering, working in, or residing near designated "areas where children are

regularly expected to be in large numbers" (*Matter of Williams v Department of Corr. &*

*Community Supervision*, 136 AD3d 147, 153 [1st Dept 2016]).  For those offenders who,

like petitioner, are unable to secure SARA-compliant housing, the condition may result in

"the paradigmatic affirmative disability or restraint"—incarceration (*Smith*, 538 US at

100).

However, this is not an as-applied challenge and Executive Law § 259-c (14)'s

carceral effect on the entire group of offenders to whom it applies is unclear from the

record.  Though this Court has recognized that there is a "dearth of SARA-compliant

housing" in New York City (*Matter of Gonzalez v Annucci*, 32 NY3d 461, 470 [2018]),

petitioner has failed to establish the extent to which Executive Law § 259-c (14) affects all

of the sex offenders to whom it applies.  Petitioner has not provided any data on how many

offenders have experienced or are experiencing prolonged incarceration due, either entirely

or in part, to SARA's school grounds condition.[2]  Nor does the record contain other relevant

information such as how many offenders are successful in locating SARA-compliant

housing prior to their anticipated release; the proportion of offenders who are subject to the

condition by virtue of committing their crime against a victim under 18 years old, their

---

[2] "[A]pproximately 295 prisoners" were on the waitlist for placement in SARA-compliant New York City homeless shelters in 2019, with the average waiting time for placement being two to three years (*People ex re. Johnson v Superintendent, Adirondack Corr. Facility*, 174 AD3d 992, 996 [3d Dept 2019, Garry, P.J., concurring]).  DOCCS asserted at oral argument that those numbers are drastically lower today.

level three designation, or both; the proportion of adjudicated sex offenders subject to the school grounds condition at all; or maps outlining the restricted geographic areas throughout the state which fall within the definition of "school grounds."

Judge Rivera's dissent acknowledges that the intent-effects test requires "focus[ ] on the punitive nature of the scheme itself, not on any idiosyncratic application of the law to an individual petitioner" and characterizes the carceral effect of the school grounds condition as a "common reality" (Rivera, J., dissenting op at 11, 19).[3] Nevertheless, the dissent inconsistently asserts "that the size of the class subject to the residency restriction is irrelevant to petitioner's facial Ex Post Facto Clause challenge" (*id.* at 20) and that "[t]he fact that some offenders identify compliant housing in time for their release date, and thus are not kept in prison, does not change the analysis" (*id.* at 15). Whether an effect is idiosyncratic or common necessarily rests on the proportion of the subjected class experiencing the effect; in fact, this is the crux of the ex post facto analysis.

Further, the scope of SARA's impact is limited in that subject offenders are only constrained by the condition while "serving [their] sentence," as the condition applies only to those released on "parole," "conditional[ ] release[ ]" (Executive Law § 259-c [14]), or "subject to a period of postrelease supervision" (*Matter of Alvarez*, 38 NY3d at 976). SARA's school grounds restriction, then, is effectively a parole condition and every parole condition constitutes an affirmative restraint which the Board of Parole has broad statutory

---

[3] This dissent does not cite any statistical evidence supporting this proposition, instead relying on only a handful of cases in which sex offenders experienced the effect (*see id.*).

authority to impose (*see* Executive Law § 259-c [2]).  For some, these conditions serve to reduce one's incarceration by allowing release before the "expiration of a valid sentence," which is not a "constitutional or inherent right of a convicted person" (*Greenholtz v Inmates of Neb. Penal & Corr. Complex*, 442 US 1, 7 [1979]).  Both at the time petitioner committed his crimes and at his open release date, the Board of Parole possessed the "power and duty of determining" whether petitioner could be released and "under what conditions" (*see* Executive Law § 259-c [2]; former Executive Law § 259-c [1]).  Such conditions include individualized residency restrictions.[4]  An additional condition does not equate to increased punishment where an offender anticipating supervised release expects the imposition of dozens of restrictions that must be satisfied prior to release (*see* Executive Law § 259-c [2]); *see also McCurdy*, 36 NY3d at 260-262).[5]  Section 259-c (14)'s general effect is thus no greater than other parole conditions which undisputedly apply to petitioner.

Second, the school grounds condition bears some resemblance to the historical punishment of banishment.  Offenders subject to Executive Law § 259-c (14) must "tailor much of their lives around these [restricted] zones" (*Does #1-5 v Snyder*, 834 F3d 696, 702

---

[4] Appellate courts have upheld the outright denial of parole release to incarcerated sex offenders for the failure to obtain a suitable residence (*see e.g. Matter of Lynch v West*, 24 AD3d 1050, 1051 [3d Dept 2005]; *Matter of Billups v New York State Div. of Parole, Chair*, 18 AD3d 1085, 1086 [3d Dept 2005]; *Matter of Wright v Travis*, 297 AD2d 842, 842 [3d Dept 2002]).

[5] This fact is particularly pertinent with regard to sex offenders, as "the State's ongoing monitoring, management and treatment of registered sex offenders, which includes the housing of registered sex offenders . . . does not end when the sex offender is released from prison" (*Diack*, 24 NY3d at 685).

[6th Cir 2016]), forced to forego certain employment and housing opportunities. Some offenders may be alienated from their friends and families who reside near a school or child-care facility. For those offenders, like petitioner, experiencing prolonged confinement while awaiting the availability of SARA-compliant housing, the condition temporarily removes them from society. Critically, however, the condition does not preclude sex offenders from living and traveling within their communities and throughout the state. The condition does not even entirely prohibit sex offenders from "ventur[ing] into restricted areas, even if they cannot reside there and/or access such areas during school hours" (*Wallace*, 40 F Supp 3d at 317). Some offenders, perhaps even the overwhelming majority,[6] find housing or employment opportunities without feeling the effects of the school grounds condition.

Third, we must consider whether the condition promotes the traditional aims of punishment: deterrence, incapacitation, rehabilitation, and retribution (*see People v Notey*, 72 AD2d 279, 282 [2d Dept 1980]; *People v Golden*, 41 AD2d 242, 243-244 [1st Dept 1973]). DOCCS concedes that the condition is intended to promote deterrence. The restriction employs the threat of a parole violation and possible reincarceration to deter sex offenders from entering into areas where children congregate, a kind of specific deterrence (*see* Black's Law Dictionary 564 [11th ed. 2019]). But this factor is of limited value here as civil regulatory schemes may "deter crime without imposing punishment" and "to hold

---

[6] As discussed, we cannot discern from this record what proportion of offenders are able to comply with SARA's school grounds condition without issue.

that the mere presence of a deterrent purpose renders such sanctions criminal would

severely undermine the Government's ability to engage in effective regulation" (*Smith*, 538

US at 102). Application of SARA's school grounds condition also results here in

incapacitation, and generally promotes the aim of incarceration by limiting sex offenders'

opportunities for recidivism (*see Matter of Williams*, 136 AD3d at 159). Similar to

deterrence, however, incapacitation "can also rightly be described as civil and regulatory"

and does not automatically transform a civil statute into a punitive one (*Snyder*, 834 F3d at

704; *see e.g. Hendricks* 521 US at 363; *United States v Salerno*, 481 US 739, 746-747

[1987]).

The "most significant factor" in the ex post facto analysis is the fourth, which

requires consideration of whether the statute has a "rational connection to a nonpunitive

purpose" (*Smith*, 538 US at 102) and here, weighs heavily against petitioner. This Court

recently considered this question in evaluating a substantive due process challenge to

Executive Law § 259-c (14) (*see Johnson*, 36 NY3d at 203).[7] As this Court held in that

case, "the temporary confinement of sex offenders in correctional facilities, while on a

---

[7] Judge Rivera's dissent attempts to draw an arbitrary distinction between rational basis review and the ex post facto's relevancy inquiry (*see* Rivera, J., dissenting op at 30). It is difficult to understand any meaningful difference between a review which requires consideration of whether a statute is "rationally related to any conceivable legitimate [s]tate purpose" (*Johnson*, 36 NY3d at 202) and a review which considers whether a statute has "a rational connection to a nonpunitive purpose" (*Smith*, 538 US at 102). The only distinction between these inquiries is that the ex post facto analysis requires that the purpose be nonpunitive. Given that *Johnson*'s rationality holding in no way rested on the restriction's punitive nature, any distinction is simply a legal fiction upon which Judge Rivera's dissent bases its disregard of *Johnson*'s precedential effect.

waiting list for SARA-compliant . . . housing, is rationally related to a conceivable, legitimate government purpose of keeping level three sex offenders more than 1,000 feet away from schools" (*Johnson*, 36 NY3d at 203).  That purpose is nonpunitive, as discussed, because it aims to "ensure[ ] that" those "who, as level three sex offenders . . . pose a high risk of recidivism" do not have "contact with minors while awaiting confirmation of appropriate residence" (*id.*).

Petitioner cites scholarship questioning the efficacy of residency restrictions on sex offense recidivism.  On this record, the empirical data, while troubling if taken at face value, is hardly conclusive in petitioner's favor, and we have no record of this scholarship's methodology or whether it has been subjected to peer review analysis.[8]  DOCCS similarly does not provide information on the efficacy of residency restrictions.  This record provides an insufficient basis for reconsideration of our prior determination in *Johnson*.  Moreover, that other, perhaps more effective, legislative measures exist to advance SARA's

---

[8] Judge Rivera's dissent posits that we are able to evaluate the methodology of one study cited by petitioner (*see* Rivera, J., dissenting op at 24-25 n 8).  This study conducted a survey asking a sample of 200 registered sex offenders in Indiana various questions to ascertain their experiences complying with a residency restriction, such as whether an offender "found it difficult to find an affordable place to live" and whether the restriction has made an offender "feel hopeless, angry and/or depressed" (*see* Jill S. Levenson & Andrea L. Hern, *Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 Just Res & Pol'y [No. 1] 59, 65-67 [June 2007]).  Given that the study relies exclusively on sex offenders' self-reporting, it is irrelevant to our analysis.  In any event, the survey results do not support a conclusion that a school grounds condition does not successfully curb recidivism; 19% of responding offenders agreed or strongly agreed to the statement that "[r]esidence restrictions help me to prevent offending" and 26% agreed or strongly agreed with the statement "I am more able to manage my risk factors because I cannot live near a school, park or playground" (*id.* at 66).

nonpunitive purpose does not negate the rational connection between that purpose and SARA's school grounds condition. Certainly, the choice of which rational policy measure to enact falls squarely within the legislature's discretion; "[t]he wisdom of a particular statute is beyond the scope of judicial review and we should not substitute our judgment for that employed by the [l]egislature in enacting the statute in question" (*A.E. Nettleton Co. v Diamond*, 27 NY2d 182, 194 [1970]). Indeed, "when a legislative enactment is challenged on constitutional grounds, there is . . . a presumption that the [l]egislature has investigated for and found facts necessary to support the legislation" (*White v Cuomo*, 38 NY3d 209, 217 [2022] [internal quotation marks omitted]). When determining which restrictions should be placed on sex offenders in order to best promote public safety, it is the legislature and not this Court that can, and perhaps should, hold hearings, invite expert testimony, and gather all relevant scholarship.[9] Petitioner's efficacy argument thus fails, at this juncture, to disprove the rational connection between the school grounds condition and the legislature's nonpunitive purpose in enacting it.

Finally, concerning the statute's proportionality to its nonpunitive purpose of protecting children, the question similarly is not "whether the legislature has made the best

---

[9] We are not suggesting that the legislature be granted blind deference in an ex post facto analysis, and certainly not in the context of evaluating the excessiveness of a statute (*see* Halligan, J., dissenting op at 4). Rather, we are bound to the record before us, which does not contain sufficient empirical evidence to warrant a departure from the legislature's reasoned judgment. A fuller record would have provided us, or may provide in the future, the opportunity to engage in a thorough assessment of the efficacy of SARA's school grounds condition; indeed, both dissents raise valid concerns about such efficacy. But whereas the legislature may revisit the condition and freely consider all scholarship, we cannot engage in fact finding beyond the record supplied by the parties themselves.

choice possible to address the problem it seeks to remedy," but instead, "whether the regulatory means chosen are reasonable in light of the nonpunitive objective" (*Smith*, 538 US at 105). Unlike the broadly and automatically applied residency restrictions of other states (*see e.g. Does v Wasden*, 982 F3d 784, 787 [9th Cir 2020] [residency restriction applies to all sex offender registrants]; *Betts*, 507 Mich at 535 [school grounds condition applies to "most [sex offender] registrants"]; *Starkey v Oklahoma Dept. of Corr.*, 2013 OK 43, ¶ 60 [2013] [residency restriction applies to all sex offender registrants]; *Commonwealth v Baker*, 295 SW3d 437, 441 [Ky 2009] ["while the original residency restriction statute applied only to those on probation or other form of supervised release, the current statute applies to all registrants regardless of probation or parole status"]),[10] New York's school grounds condition is carefully tailored so as to burden only "two, possibly overlapping, populations of sex offenders that the legislature has assessed as presenting the severest threat to children"—offenders who have already abused children and offenders adjudicated level three offenders, convicted of an enumerated offense (*Wallace*, 40 F Supp 3d at 318-320). In limiting the condition's application to these two categories of offenders, those most likely to reoffend, the legislature has ensured a measure of individualized assessment prior to the condition's imposition. Offenders who have

---

[10] These cases, and the others cited in Judge Halligan's dissent as examples where courts "invalidat[ed] sex offender residency restrictions," concern restrictions that generally applied to registrants regardless of parole or probation status (*see* Halligan, J., dissenting op at 5 n 3). Under the New York scheme, the SARA school grounds condition applies only to those who are on parole, conditional release, or post-release supervision, a critical distinction.

committed sex offenses against children have shown themselves capable of harming children and those adjudicated level three under SORA have undergone an "individualized" assessment, by a judge, of their "calculated risk to reoffend" and the threat they present to public safety (*People v Perez*, 35 NY3d 85, 88 [2020] [internal quotation marks omitted]). Indeed, it is because of that fact-intensive adjudication that level three offenders serving a sentence for an enumerated offense are subject to this condition at all. Every court, in conducting SORA hearings, considers the unique lived experiences, circumstances, and conduct of each offender, and no hearing results in a level three risk assessment in precisely the same manner. Importantly, these adjudications consider facts beyond a sex offender's underlying crime and conviction, including their conduct since the commission of their crimes (*People v Kaff*, 149 AD3d 783, 784 [2d Dept 2017]) and whether the offender has a "history of drug or alcohol abuse" (*People v Palmer*, 20 NY3d 373, 376 [2013]). Further, the school grounds condition applies only as long as the offender is on parole, probation, or conditional release; in other words, it applies only while the offender is still serving their sentence (*Matter of Alvarez*, 38 NY3d at 976). For many offenders, the condition is a temporary imposition, and for all, the condition expires when the sentence terminates.

The legislature's careful application of SARA's school grounds condition to the populations of sex offenders who have demonstrated the highest risk to the health and safety of children cannot be deemed excessive. "The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences"; rather, a legislature's

"determination to legislate with respect to convicted sex offenders as a class . . . does not make the statute a punishment under the Ex Post Facto Clause" (*Smith*, 538 US at 103-104 [emphasis omitted]). Even if the legislature could impose individualized assessment beyond what already occurs, "[t]he legislature is not required to act with perfect precision, and its decision to cast a net wider than what might be absolutely necessary does not transform an otherwise regulatory measure into a punitive sanction" (*Doe v Pataki*, 120 F3d 1263, 1283 [2d Cir 1997]).

Undoubtedly, requiring petitioner to satisfy Executive Law § 259-c (14)'s school grounds condition before he is entitled to release may result in harsh consequences. But "a statutory scheme that serves a regulatory purpose 'is not [necessarily] punishment [for ex post facto purposes] even though it may bear harshly on one affected' " (*id.* at 1279, quoting *Fleming v Nestor*, 363 US 603, 614 [1960]). "[T]he mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment" (*Salerno*, 481 US at 746) and it does not here. Certainly, there are level three offenders who abide by the school grounds condition and are released from confinement when expected.

While some factors may favor petitioner, the most significant factors decisively militate against finding a constitutional violation. We are unable to conclude from this record that prolonged incarceration is a common result of Executive Law § 259-c (14), rather than an idiosyncratic effect, and the Supreme Court has "expressly disapproved of evaluating the civil nature of [a statute] by reference to the effect that [statute] has on a single individual" (*id.* at 262). Petitioner has failed to meet the heavy burden of

demonstrating, by the clearest proof, that the effects of Executive Law § 259-c (14) are "so punitive . . . as to negate [the legislature's] intention to deem it civil" (*Smith*, 538 US at 92 [internal quotation marks omitted]).[11]   We therefore cannot disturb the legislature's judgment and conclude that the provision, on its face, violates the Ex Post Facto Clause of the United States Constitution.  Accordingly, the order of the Appellate Division insofar as appealed from should be affirmed, without costs.

---

[11] Remittal is inappropriate (*see* Halligan, J., dissenting op at 8).  Petitioner has failed to meet his heavy burden of demonstrating that Executive Law § 259-c (14) is unconstitutional—a proposition with which Judge Halligan appears to agree.  To the extent Judge Halligan suggests the record should be expanded, petitioner should not now be granted an opportunity to bolster the record and provide the relevant support that he should have, and could have, provided initially.  To the extent Judge Halligan suggests the Appellate Division should reconsider their legal analysis, that is a question of law that may be resolved by this Court, thereby obviating the need for remittal.  Moreover, neither party has requested remittal for further review.

RIVERA, J. (dissenting):

"No State shall . . . pass . . . any ex post facto law" (US Const art I, § 10, cl 1).

"The creation of crimes after the commission of the fact, or, in other words, the subjecting of [persons] to punishment for things which, when they were done, were breaches of no law, and the practice of arbitrary imprisonments,

- 1 -

have been, in all ages, the favorite and most formidable instruments of tyranny" (Hamilton, Federalist No. 84).

The Ex Post Facto Clause "restricts governmental power by restraining arbitrary and potentially vindictive legislation" (*Weaver v Graham*, 450 US 24, 29 [1981]). This constitutional prohibition on "after the fact" state legislation means that actions cannot be made criminal retroactively and punishment for prior criminal behavior cannot be increased at a later time (*Beazell v Ohio*, 296 US 167, 170 [1925]). Thus, the Clause prohibits an expressly retroactive penal law as well as a statutory scheme intended to be civil in nature if the scheme's "purpose or effect" is so punitive that it "negates the State's intention to deem it civil" (*Smith v Doe*, 538 US 84, 92 [2003]).

The latter is the case here where persons, like petitioner, committed crimes before New York enacted and amended the comprehensive sexual offender scheme that today imposes upon them a residential prohibition enforced under the threat of potentially indefinite incarceration of those probationers, parolees, and conditionally-released prisoners who cannot afford housing outside the prohibited community zones. Moreover, empirical studies have undermined prior assumptions about the efficacy of the statutory scheme's residential prohibition to achieve its intended goal of protecting children and suggest that such restrictions may increase the risk of reoffense. The nexus between the legislative purpose and the means adopted is "a most significant factor" in the constitutional analysis, as is the excessiveness of a condition which fails to account for the

lack of a positive result and may increase the risk of public harm. The regulatory scheme's residency prohibition therefore violates the Ex Post Facto Clause.

I.

In 1996, the Legislature enacted the Sex Offender Registration Act ("SORA"), establishing a notification and sex offender registration scheme, with the stated purpose of addressing "the danger of recidivism posed by sex offenders" by repairing "the lack of information about sex offenders" available to law enforcement and the "failure of the criminal justice system to identify, investigate, apprehend[,] and prosecute sex offenders" (L 1995, ch 192, § 1). The law requires that all persons who commit certain specified sex offenses register with the State Division of Criminal Justice Services, which maintains a publicly-available database of their information known as the Sex Offender Registry (Correction Law §§ 168-a, 168-b, 168-c; *see generally* L 1995, ch 192). The following year, the law survived an ex post facto challenge in federal court. Although acknowledging that "the question is not free from doubt," the Second Circuit reversed the district court and concluded that SORA's registration and notice provisions did not "constitute 'punishment' for purposes of the Ex Post Facto Clause" (*Doe v Pataki*, 120 F3d 1263, 1265 [2d Cir 1997]).

SORA has been amended since 1996 and the Second Circuit's resolution of this close question. Those amendments expanded the types of offenders and crimes covered, made public access easier by mandating internet posting, and extended the duration of notification and registration, including, most notably, imposing lifetime registration for a

larger class of sex offenders (*see* L 1999, ch 453, §§ 1-5; L 2002, ch 11, §§ 1-5; L 2003, ch 69, § 4; L 2004, ch 146, § 1; L 2006, ch 91, § 1; L. 2006, ch 107, § 9; L 2006, ch 320, § 8; L 2007 ch 7, §§ 10, 22; L 2007 ch 74, § 9; L 2008, ch 67, § 3; L 2008, ch 232, § 1; L 2008, ch 303, § 1; L 2008, ch 405, § 2; L 2011, ch 513, § 1; L 2015, ch 368, § 5; L 2018, ch 189, § 7). Thus, with a few keystrokes, any member of the public has access to certain personal information of a registered offender.

SORA applies to all offenders regardless of whether they are discharged, placed on probation, or released on conditional release, parole, or post-release supervision and varies the level of personal detail the offender must provide for public notice, depending on their judicially-determined risk level (Correction Law §§ 168-e, 168-l, 168-n). The sentencing court classifies an offender's risk level—1, 2 or 3 in ascending order of risk—after a SORA hearing, and upon review of the Board and prosecutor's respective recommendations and a judicial finding of clear and convincing evidence supporting the classification (*see* Correction Law §§ 168-n [2]-[3]).

In 2000, the Legislature enacted the Sexual Assault Reform Act ("SARA") which, as relevant to this appeal, codified a new Executive Law § 259-c (14). SARA bars sex offenders whose victims were minors and who are "released on parole or conditionally released" from knowingly entering "school grounds" or the grounds of a "facility or institution primarily used for the care or treatment of [minors]" as a condition of their release (L 2000, ch 1, § 8).[1] The Legislature amended SARA in 2005, expanding its reach

---

[1] In *Matter of Alvarez v Annucci*, the Court held that SARA applies to offenders released to post-release supervision (38 NY3d 974, 977 [2022]).

to all SORA level 3 offenders—even if the victim was an adult—and adopting the definition of "school grounds" contained in Penal Law § 220.00 (14), which includes any publicly-accessible area within 1000 feet of schools, athletic fields, and playgrounds. Thus, the legislature in SARA adopted a residency prohibition which bans covered offenders from living within the restricted area (L 2005, ch 544, § 2; *see also People v Diack*, 24 NY3d 674, 681-682 [2015]). A SARA violation subjects the offender to reincarceration, potentially indefinitely (Executive Law § 259-c [14]).

## II.

### A.

Petitioner Danny Rivera was 16 years old when he was arrested in 1986 and just 17 years old when he pleaded guilty to murder, attempted murder and rape—horrific acts for which he was sentenced to 20 years to life in prison. Thirty-three years later, in April 2019, the Board of Parole ("Board") was persuaded that petitioner could return to society after he explained during his parole hearing that he became involved with certain criminal elements in Puerto Rico at a young age, and could not "justify" his actions which he was ordered to carry out and for which he was "ashamed." He further explained that, while in prison, he completed a sex offender treatment program during which he came to understand the pain he brought his victims and their families and that, "through 30 something plus

years[, he had] learned to be somebody else than who [he] was when [he] was 17." The Board granted him a May 23, 2019 open parole date.

After a SORA hearing in June 2019, petitioner was classified as a level 3 offender and, under the 2005 SARA amendment, subject to the school grounds condition and its obligatory residency prohibition. Petitioner did not have a SARA-compliant residence. As a result, he remained incarcerated until March 2021—more than 21 months past his open parole date. It is undisputed that the lack of a SARA-compliant residence was the sole obstacle to his release during that period.

SORA and SARA did not exist when petitioner committed the crimes which now subject him to the sex offender regulatory scheme; and the legislature did not enact the amendment extending SARA to cover him until almost 20 years after his conviction. Petitioner successfully challenged the statutory scheme on ex post facto grounds in Supreme Court, which concluded that there was no "justification for saying that the SORA laws are not punitive when the [p]etitioner's being held in prison and incarcerated solely because of these laws." The Appellate Division reversed but, by then, petitioner had secured SARA-compliant housing and was released to parole. However, petitioner is serving a life sentence and, unless we hold otherwise, will therefore be subject to SARA's

school grounds prohibition and residency requirement every day for the rest of his life (*see* Executive Law § 259-c [14]).

B.

On appeal to this Court, petitioner argues—as he did before Supreme Court—that the "combined effect" of SORA and SARA violates the Ex Post Facto Clause of the federal constitution because the 2005 amendments to SARA brought offenders like him "into the ambit of SARA and the residency restrictions that have served to prolong [his] incarceration" even when they committed their offenses against non-minors before 2005.

The majority rejects this framing because, in its view, "petitioner does not assert that the effects of SORA, beyond its operation by which [he] was adjudicated a level three offender subjecting him to SARA's school grounds condition, are punitive" (majority op at 5). Therefore, the majority posits, "only [the school grounds condition] is at issue in this case" (*id.*) This is misdirection because, as the majority acknowledges, petitioner is only subject to the SARA residency prohibition *because* of his SORA classification, and thus the punitive effects are a direct result of the interplay between SORA and SARA (*id.*). In other words, SARA references SORA to identify offenders who cannot live within 1000 feet of school grounds.

Contrary to the majority's suggestion, SORA is more than a mere definitional reference for SARA in that the SORA risk classification imposes its own set of notification and registration requirements, including public access to his address. As intended by the legislature, SORA and SARA are two critical, interlocking components of the State's

unitary sex offender regulatory scheme for the "ongoing monitoring, management and treatment of registered sex offenders" (*see People v Diack*, 24 NY3d 647, 685 [2015]). That scheme applies to a specific class of convicted individuals—sex offenders. Its purported goal is to protect the public: SORA sets forth the registration and notification requirements for sex offenders and SARA imposes the residency prohibition on specific categories of sex offenders. SORA is a vital component of the government's enforcement of SARA and the regulatory scheme establishes a seamless, integrated application of these statutes. Since SORA and SARA work in tandem to monitor and control sex offender behavior, the issue on appeal is whether this integrated scheme, on its face, violates the Ex Post Facto Clause.[2] However, even limiting our review to SARA yields the same result: the residency prohibition is facially unconstitutional.

III.

The Ex Post Facto Clause was intended as a "constitutional bulwark in favor of personal security and private rights" whose addition to the original Constitution was driven by an awareness of "sudden changes and legislative inferences, in cases affecting personal rights" (Madison, Federalist No. 44). Even before its seminal decision in *Marbury v Madison* (1 Cranch 137, 5 US 137 [1803]), the United States Supreme Court held in *Calder v Bull*, that under the Clause, "[t]he Legislature may enjoin, permit, forbid, and punish; they may declare new crimes; and establish rules of conduct for all its citizens in future

---

[2] Consequently, a holding to this effect would impact only offenders whose criminal actions predated the enactment of SORA and SARA.

cases; they may command what is right, and prohibit what is wrong; *but they cannot change innocence into guilt; or punish innocence as a crime*" (3 US 386, 388, 3 Dall 386, 388 [1798] [Chase, J.] [emphases added]). The Court explained that the Clause does not prohibit all retroactive legislation, but only those statutes that: (1) make an action which was completed before the passing of the law criminal and punish it accordingly; (2) aggravate a crime to make it more serious than when the defendant was alleged to have committed it; (3) increase the punishment for an alleged crime committed when the punishment was less or different at the time of the crime's commission; or (4) "change the rules of evidence, for the purpose of conviction" (*see Calder*, 3 US at 390-391, 3 Dall at 390-391).

As a general matter, "the prohibition extends to criminal, not to civil cases" (3 US at 399, 3 Dall at 399 [Iredell, J.]) and this Court has noted that it generally "applies only to penal statutes[,]" (*Kellogg v Travis*, 100 NY2d 407, 410 [2003], citing *Collins v Youngblood,* 497 US 37, 41 n 2 [1990]).[3] However, the Court has also recognized that because the Ex Post Facto Clause prohibits "after the fact" punishment, even a statute intended to be civil in nature may violate the Clause if, in operation, the law is sufficiently punitive to overcome the legislative intent for civil regulation (*id.* at 410 [noting that

---

[3] Justice Thomas has openly questioned *Calder's* civil/criminal distinction and, in a case involving a retrospective imposition of liability on a property owner, signaled a willingness to reconsider it (*see E. Enterprises v Apfel*, 524 US 498, 539 [1998] [Thomas, J., concurring] ["I would be willing to reconsider *Calder* and its progeny to determine whether a retroactive civil law that passes muster under our current Takings Clause jurisprudence is nonetheless unconstitutional under the *Ex Post Facto* Clause"]).

"where the challenged statute does not seek to impose a *punishment,* it does not run afoul of the Ex Post Facto Clause"]). Punishment is the sine qua non of an ex post facto violation.

As the Supreme Court has observed, for ex post facto purposes, "the punishment of imprisonment . . . is the paradigmatic affirmative disability or restraint" (*Smith*, 538 US at 100); *see also Flemming v Nestor*, 363 US 603, 617 [1960] [referring to "the infamous punishment of imprisonment" in an ex post facto case]). To show that his imprisonment was punishment, petitioner had the burden of showing "the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil" (*Hendricks*, 521 US at 361).   Petitioner concedes that the legislature did not pass SORA or SARA with punitive intent, a view supported by Supreme Court precedent (*see Kansas v Hendricks*, 521 US 346, 361 [1997]; *United States v Ward*, 448 US 242, 248 [1980]). The question then is "whether the legislative aim" in enacting the sex offender regulatory scheme's residency prohibition "was to punish" individuals like petitioner "for past activity, or whether the restriction" is based on "a relevant incident to a regulation of a present situation" given the "unpleasant consequences" that attend the scheme (*De Veau v Braisted*, 363 US 144, 160 [1960]).

The Supreme Court applied this "intent-effects test"—originally devised to evaluate federal penal and regulatory laws—in *Smith v Doe*, to uphold Alaska's registration-and-notification statute—which did not include SARA-like restrictions—against an ex post facto challenge (538 US at 105-106).[4] At the first step, if the Court

---

[4] Five years after the Court' decision in *Smith*, the Alaska Supreme Court invalidated retroactive application of the statute under the Ex Post Facto Clause of the Alaska State

determines that the legislature intended to impose punishment the inquiry ends and the law must be stricken (*id.* at 92-93). If the statute has a nonpunitive intent then the Court applies factors previously "designed to apply in various constitutional contexts" (*id.* at 97). The most relevant in an ex post facto analysis as "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose" (*id.*, citing *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169 [1963]). Applying those factors to Alaska's registration-and-notification scheme, the Court concluded that it was "nonpunitive" and that "its retroactive application [did] not violate the Ex Post Facto Clause" (*id.* at 105-106).

The intent-effects test and its multiple factors focus on the punitive nature of the scheme itself, not on any idiosyncratic application of the law to an individual petitioner (*see Seling v Young*, 531 US 250, 262-263 [2001] ["The civil nature of a confinement scheme cannot be altered based merely on vagaries in the implementation of the authorizing statute"]). Thus, in *Seling*, the Supreme Court rejected double jeopardy and ex post facto challenges to the conditions of confinement brought by sex offenders involuntarily committed under Washington state law because of the variability of the conditions imposed on individual offenders in Washington (*id.* at 263). Seling sought

_____

Constitution, applying an intent-effects test modeled on Supreme Court precedent, and holding that the law "imposes burdens that have the effect of adding punishment beyond what could be imposed when the crime was committed" (*Doe v State*, 189 P3d 999, 1000, 1007-1019 [Alaska 2008]).

release based on his claim that his conditions of confinement effectively rendered the scheme punitive as-applied to him because those conditions were more restrictive than those imposed on "true civil commitment detainees, and even state prisoners" (*id.* at 260). The Court concluded that Seling's claim was a true "as applied" challenge because "the Act is silent with respect to the confinement conditions required [where Seling was confined], and that is the source of many of [his] complaints" (*id.* at 264). In other words, since Seling's conditions were not statutorily set, neither was the nature of the confinement "fixed" (*id.* at 263).

The Supreme Court then reasoned that Seling's "as applied" challenge was "unworkable" because it "would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the [ ] Ex Post Facto Clause[ ]" (*id.*). As the Supreme Court explained, because the "conditions are subject to change" during confinement, they "affect how a confinement scheme is evaluated to determine whether it is civil rather than punitive, but it remains no less true that the query must be answered definitively" (*id.*).

The majority posits that "the proportion of the subjected class experiencing the effect . . . is the crux of the ex post facto analysis (majority op at 9). My dissenting colleague Judge Halligan suggests that *Seling* does not "allow[ ] us to focus our analysis exclusively on that group of offenders" who are subject to incarceration solely because they are SORA level 3 offenders who are unable to locate SARA-compliant housing because "we do not know how many individuals have been, or likely will be, subject to prolonged incarceration due to SARA's residency restriction" (Halligan, J., dissenting op

at 2). Both "criticisms" buckle under scrutiny on their own terms. Neither opinion even attempts to set a minimum threshold number of persons previously or currently incarcerated as a result of the statutory scheme before an individual may challenge it under the Ex Post Facto Clause, although both are quick to conclude that petitioner has failed to meet their unknown numerical floor. Whatever number they have in mind—if any—both the majority and Judge Halligan fail to explain why we should disregard numerous court decisions that confirm that there are many such individuals (*see People ex rel. Johnson v Superintendent, Adirondack Corr. Facility*, 174 AD3d 992, 996-997 [3d Dept 2019] [Garry, P.J. concurring]).

In addition to these internal deficiencies, both views completely misunderstand the fundamental difference between an as-applied and a facial challenge. The number of injured parties is not dispositive of—nor even relevant to—this analytic distinction. What matters are the substantive nature of the claim and the remedy sought. The premise of a facial challenge is "that a law is unconstitutional in all of its applications" and thus the court considers "only applications of a statute in which the statute actually authorizes or prohibits conduct" (*City of Los Angeles, Calif. v Patel*, 576 US 409, 418 [2015]). In contrast, as *Seling* makes clear, an as-applied ex post facto challenge is one that turns on the individual's unique circumstances rather than the commands of the statute (*see* 531 US at 263).

The Supreme Court's analysis in *Smith* confirms this elemental distinction. In rejecting the Alaska petitioner's claim, the Court observed that the record in that case did not show that Alaska's registration and notification scheme "ha[d] led to substantial

occupational or housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords" and that "[a]lthough the public availability of the information may have [had] a lasting and painful impact on the convicted sex offender, these consequences flow[ed] not from the [scheme's] registration and dissemination provisions, but from the fact of conviction" (*Smith*, 538 US at 100-101). In other words, the Alaska law might have violated the Ex Post Facto Clause had its "disadvantages" been traceable directly to the law itself (*id.* at 100).

That is the case here, where petitioner challenges the statutory scheme that imposes a residency prohibition on a defined classes of sex offenders into which he falls, and whose scope is tethered to a Penal Law definition.[5] Unlike the civil confinement conditions challenged in *Seling*—which would have required the Supreme Court to review conditions based on factors external to the Washington law at issue there—the residency prohibition here is "fixed" on the face of the law (*Seling*, 531 US at 263). And, unlike some other parole conditions the Board imposes based on an individualized assessment of the prisoner's circumstances, reentry needs, and potential risk to reoffend (*see* Executive Law §§ 259-c [2]), the Board has no discretion to disregard the residency prohibition (*see id.* § 259-c [14] [providing that "the board *shall* require, as a mandatory condition" compliance with the school grounds condition] [emphasis added]). Moreover,

---

[5] The majority also ignores that the appeal comes to us from the Appellate Division in the procedural posture of a declaratory judgment action as to whether the scheme violates the Ex Post Facto Clause (*see* 200 AD3d at 1370).

the Department of Corrections and Community Supervision (DOCCS) cannot release an offender to a noncompliant residence.[6] Either deviation from the statutory mandate would defeat the intended purpose of the residency prohibition.

We would have a true as-applied challenge before us under the analysis in *Seling* if, for example, petitioner, claimed that he was incarcerated beyond his open parole date based on the Board's misreading of the circumstances of his conviction or classification (*e.g. Matter of Champion v Dennison*, 40 AD3d 1181, 1182 [3d Dept 2007] [challenge to denial of parole based partly on the Board's miscalculation of parole guideline range]). The same would also be true if, for example, petitioner argued that the Board erroneously denied approval of housing that it approved as compliant for others had successfully presented. Resolving those challenges would require us to consider the idiosyncrasies of the petitioner's circumstances and "vagaries in the implementation of the authorizing statute[,]" not whether the scheme causing extended incarceration is itself definitively facially punitive in violation of the Ex Post Facto Clause (*Seling*, 531 US at 263).

The fact that some offenders identify compliant housing in time for their release date, and thus are not kept in prison, does not change the analysis or lead to a different conclusion (majority op at 8-9). First, the Court has previously recognized that the housing

---

[6] In *Johnson*, the Court rejected a substantive due process challenge to DOCCS' practice of refusing to release an offender to parole who seeks to live in New York City, and in the companion case, *People v Ortiz*, the Court also rejected an Eighth Amendment claim based on deliberate indifference, both constitutional challenges were grounded in the offenders' rights to placement at a homeless shelter outside banned school grounds (36 NY3d at 196-202, 203-205). The Court upheld the extension of incarceration for those offenders willing to live in a SARA-compliant shelter.

prohibition results in incarceration and has a disproportionate impact on offenders seeking housing in New York City (*see Johnson*, 36 NY3d at 206 [observing that "New York City's SARA-compliant shelters have a vacancy rate of 0.4%, indicative of the high demand for shelter housing in New York City generally, as well as the considerable number of SARA-subject sex offenders seeking such housing"]; *Gonzalez v Annucci*, 32 NY3d 461, 472 [2018] [acknowledging "the intractable problems presented by inmates convicted of sex offenses who must obtain SARA-compliant housing and must do so in a very limited market without financial resources"]).[7] United States Supreme Court Justice Sotomayor has observed the same in comments regarding our Court's ruling in *Ortiz* (*Johnson*'s companion case) (*see Ortiz v Breslin*, 142 S Ct 914, 915 [2022] [Sotomayor, J., statement regarding denial of certiorari] ["In effect, New York's policy requires indefinite incarceration for some indigent people judged to be sex offenders"]). Second, the legally relevant question is not whether some individuals can avoid the immediate effects of the school grounds condition, but whether this ban on residency—which applies for the entire

---

[7] Indeed, New York City's housing shortage has increased so dramatically as has the demand for shelter that the City's Mayor recently filed an application in Supreme Court to modify the consent decree in *Callahan v Carey* (Sup Ct, NY County, Aug. 1981, Index No. 42582/79), which over 40 years afo established New York City's right to shelter (*see* Jonathan Pines, Esq., Letter Application for Modification of Final Judgment [May 23, 2023], *available at* https://www.nyc.gov/assets/home/downloads/pdf/press-releases/2023/city-application-to-justice-kaplan-callahan-v-carey-5-23-23.pdf [last accessed June 7, 2023]).

duration of the offender's sentence and which is enforced by incarceration—is punishment for ex post facto purposes.

Properly understood in this light, the residency prohibition violates the Ex Post Facto Clause simply because failure to comply with it—both before and after release—results in the "paradigmatic" punishment: incarceration (*Smith*, 538 US at 100).

IV.

The majority relegates to the periphery the residency prohibition's effect of incarcerating offenders beyond their release date and after release, the condition hangs over offenders like a sword of Damocles, with its ever-present risk of reincarceration should an offender lose compliant housing. Even ignoring that this is punishment, application of the effects factors still compels the conclusion that the residency prohibition is so punitive that it cannot be deemed civil in effect (*see id.* at 105-106).

Taking the factors in the order followed by the majority, by its terms the residency prohibition imposes an affirmative disability or restraint, as it prohibits offenders from entering "(a) in or on or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (b) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicle located within one thousand feet of the real property boundary line comprising any such school" (Penal Law § 220.00 [14]). The majority agrees that this is an "affirmative restraint" but

compares it to every other "affirmative restraint which the Board of Parole has broad statutory authority to impose[,]" in an attempt to diminish how this factor favors petitioner (majority op at 8-9). However, the premise of the majority's position is unfounded since, as discussed *supra*, the residency prohibition is a "mandatory condition" that the Board is statutorily obligated to impose on all offenders subject to SARA (Executive Law § 259-c [14]). Moreover, this is a legislatively chosen condition, not one that the Board has determined to be necessary in every case. Certainly, it would be hard to argue as much with respect to offenders like petitioner, who was a teenager when he committed the crimes for which he remained incarcerated and which he committed against an adult, not a child. Apart from the regulatory framework that leaves no room for Board discretion, there is the simple fact that any condition of parole that limits where an offender may live is subject to constitutional scrutiny (*e.g. United States v Myers*, 426 F3d 117, 123-126 [2d Cir 2005] [reviewing constitutionality of a supervised release condition requiring sex offender to obtain governmental permission before seeing his child unsupervised] [citing *Troxel v Granville,* 530 US 57, 65-66 [2000] [plurality]; *Arciniega v Freeman*, 404 US 4, 4 [1971] [parole condition restricting association "with other ex-convicts" could not include "incidental contacts between ex-convicts in the court of work on a legitimate job for a common employer"]).

The majority's assertion that the "carceral effect on the entire group of offenders to whom it applies is unclear from the record" is another—albeit no more persuasive—version of its argument in support of a conclusion that not every offender is incarcerated for lack of compliant housing (majority op at 8). The majority ignores numerous public

reports and court decisions confirming that, for offenders subject to the residency prohibition, incarceration beyond the release date is a common reality which the majority acknowledges, is " 'the paradigmatic affirmative disability or restraint' " (majority op at 8, quoting *Smith*, 538 US at 100; *see* New York City Bar Association, *The Impact and Legality of Sex Offender Residency Restrictions Created By New York's Sexual Assault Reform Act* [October 2016] ["City Bar Report"] at 9-10; *Johnson*, 36 NY3d at 206; *Gonzalez*, 32 NY3d at 472).

For similar reasons, the residency prohibition resembles what has historically and traditionally been considered criminal punishment (*see Smith*, 538 US at 97). The sole mechanism for enforcing the prohibition when an offender does not have compliant housing is incarceration. Before release, an offender will remain incarcerated if they are unable to locate SARA-compliant housing. Post-release, they are live under the fear of being returned to prison if they lose their compliant housing. That fear is well-founded, as there is no civil cure and no excuse for a violation, even if the cause of the violation is completely beyond the offender's control—for example, if a local government later declares the compliant residence uninhabitable. The majority's further assertion that the residency prohibition has limited impact because it applies only during the period of an offender's sentence and only applies to those on parole, conditional release, or post-release supervision (*see* majority op at 9) overlooks the many offenders like petitioner who are subject to lengthy sentences—including, as here, life. More fundamentally, this assertion

also elides that the size of the class subject to the residency restriction is irrelevant to petitioner's facial Ex Post Facto Clause challenge.

In addition, the residency prohibition is a modern-day form of banishment, long recognized as a grave form of punishment, biblical in standing (*see e.g.* Exodus 31:14 ["Therefore you are to observe the sabbath, for it is holy to you . . . . (W)hoever does any work on it, that person shall be cut off from among (their) people"]; Jeremiah 23:39 [Therefore, behold, I will surely forget you and cast you away from My presence, along with the city which I gave you and your fathers"]). As the *Smith* Court observed, "[s]ome colonial punishments indeed were meant to inflict public disgrace" and "[t]he most serious offenders were banished, after which they could neither return to their original community nor, reputation tarnished, be admitted easily into a new one" (538 US at 97-98). The Court concluded that the Alaska statute did no such thing, as it was a first-generation registration-only requirement (*see id.*). The Alaska statute did not restrict where offenders lived, worked, or traveled (*see Smith*, 538 US at 101)—activities among the hallmarks of membership in a free, democratic society (*see also* Tobias Kuehne, *Immigration and Employment Federalism: State Courts and Workers' Compensation for Unauthorized Workers*, 43 Berkeley J Emp & Lab L 415, 434 [2022] [focusing on "the role of work" as an element "that goes to the heart of what it means to have full membership in a community"]; James W. Fox, Jr., *Liberalism, Democratic Citizenship, and Welfare Reform: The Troubling Case of Workfare*, 74 Wash ULQ 103, 142 [1996] ["The ability to live and to live in such a way that one can minimally participate in democratic activity validates one's membership in a community of human dignity. It also validates the

community as dignified"]; Linda S. Bosniak, *Membership, Equality, and the Difference That Alienage Makes*, 69 NYU L Rev 1047, 1075 [1994] [tying one's place of residence and labor to "the fundamental moral commitments of democratic community life"]). Government-imposed banishment is anathema to a free society and New York's comprehensive sex offender scheme imposes it by banishing all level 3 offenders like petitioner from many locations within our State, including most of New York City.

The majority acknowledges that "the school grounds condition bears some resemblance to the historical punishment of banishment" but asserts that this banishment is of a lesser grade because the condition "does not preclude sex offenders from living and travelling within their communities and throughout the state" (*see* majority op at 10). Offenders can also live and travel outside New York State's borders, but "freedom" to do so does not make it any less true that they are banished from designated areas of the State, including in some cases where their support networks are located. Historically, intrastate banishment has existed as a form of punishment (*see* Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 Mich L Rev 1179, 1234, 1238 [1982] [describing banishment in colonial Massachusetts as "a one-way ticket out of town" and observing that, in the early decades of the 1800s, population growth and increased ease of travel contributed to the increased popularity of imprisonment as an alternative to "banishment by way of escort to the town limits"]). Plainly, the regulatory scheme precludes offenders from freely living and travelling within their communities, as they cannot live or even enter within 1000 feet of the defined zones. Under the combined effects of SORA's notification and registration requirements and SARA's residency

prohibition, covered offenders "suffer 'permanent stigmas, which in effect cast [them] out of the community' . . . after which they c[an] neither return to their original community nor, reputation tarnished, be admitted easily into a new one" (*Smith*, 538 US at 98, quoting Toni M. Massaro, *Shame, Culture, and American Criminal Law*, 89 Mich L Rev 1880, 1913 [1991]).

Like SORA's notification and registration requirements, the ban aims to deter criminal behavior and reduce recidivism (*see Doe*, 120 F3d at 1283), which are "traditional aims of punishment" (*Mendoza-Martinez*, 372 US at 168). The legislature clearly believed that prohibiting offenders from entering and remaining on school grounds would protect children and thus deter sexual recidivism against this vulnerable population (*see* NY State Assembly Mem in Support of Legislation, *reprinted in* Bill Jacket for L 2005 ch 544 at 4 [observing that the 2005 amendment was in response to the "need to prohibit those sex offenders who are determined to pose the most risk to children from entering upon school grounds or other areas where children are cared for"]). A worthy goal but one achieved, in part, through punishment imposed on those who committed their crimes before enactment of the statutory regulatory scheme, further supporting the conclusion that retroactive application violates the Ex Post Facto Clause.

The remaining factors—whether the residency prohibition is rationally connected to a nonpunitive purpose and is excessive in relation to that nonpunitive purpose—are properly considered together, given their overlapping subject matter. The majority is correct that the regulatory scheme's "rational connection to a nonpunitive purpose is a 'most significant' factor in [the] determination" of whether "the . . . effects

are . . . punitive" (*Smith*, 538 US at 102, quoting *United States v Usery*, 518 US 267, 290 [1996]). But so is the excessiveness inquiry. Even a law rationally connected to a nonpunitive purpose may be so disproportionately burdensome compared to its intended societal benefit that it has an overall, outsized punitive effect. Here, for this principal reason, the residency prohibition is not rationally connected to a nonpunitive purpose and is excessive.

The legislators passed SARA and its 2005 amendments with the express aim of deterring recidivism and protecting children from convicted sex offenders (*see* Mem from Kathy A. Bennett, reprinted in Bill Jacket, L 2000, ch 1 at 5; Letter from Harvey Weisenberg, reprinted in Bill Jacket, L 2005, ch 544 at 3; *Diack*, 24 NY3d at 686 [observing SARA's "focus on those sex offenders who have been designated as exhibiting a moderate to high risk of recidivism"]). However, strong evidence has since emerged that school-ground buffer zones are an ineffective means for accomplishing those ends and thus attenuate any rational connection with their supposedly nonpunitive objective (*see* Jill S. Levenson & Andrea L. Hern, *Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry*, 9 Just Res & Pol'y [No. 1] 59, 61 [June 2007] [study in Minnesota tracking recidivism rates for high-risk sex offenders finding that, of the 4% who committed new sex crimes "(n)one of the new crimes occurred on the grounds of a school or was seemingly related to a sex offender's living within close proximity to a school" and concluding that "residential proximity to schools and parks appeared to be

unrelated to sex offense recidivism" and that "blanket policies restricting where sex offenders can live are unlikely to benefit community safety"]).

Most troubling and significant for our constitutional analysis is other evidence suggesting that SARA-like restrictions actually *increase* the risk of recidivism and put more children in harm's way (*see e.g.* Christopher Lobanov-Rostovsky, *Chapter 8: Sex Offender Management Strategies*, in U.S. Department of Justice, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Sex Offender Management Assessment and Planning Initiative* at 205 [NCJ 247059, Oct. 2014], *available at* https://smart.ojp.gov/sites/g/files/xyckuh231/ files/media/document/somapi_full_report.pdf [last accessed May 30, 2023]; U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics* at 10 [NCJ 182990, July 2000] [assessing that, in 93% of sex crimes involving children, the offender was not a stranger, but somebody the child knew]).[8]

Notably, respondents have not countered petitioner's argument that residency requirements do not achieve their intended goals. If they tried, they would have had a steep

---

[8] The majority's concerns about references to reliable empirical data have not troubled other courts, which have cited empirical data to conclude that sex offender residency laws fail to achieve their intended goals (*e.g.*, *Does #1-5 v Snyder*, 834 F3d 696, 704-705 [6th Cir 2016]; *People v Betts*, 507 Mich 527, 559-562, 968 NW2d 497, 513-515 [2021]). In any case, the majority's concerns here are misplaced. Specifically, the majority dismisses these sources as "hardly conclusive" and complains that "we have no record of this scholarship's methodology or whether it has been subjected to peer review analysis[,]" yet also acknowledges the Levinson & Hern study's summary of its methodology and raw data (majority op at 12; *id.* n 8; *see* Levenson & Hern, *supra*, 9 Just Res & Pol'y [No. 1] at 64-67). In addition, the journal which published the study subjects submissions to a "peer

mountain to climb, given the profession's growing recognition that these requirements, though perhaps well intended, are not furthering public safety and, in fact, may be placing us at greater risk.

A 2016 joint report of the New York City Bar's Criminal Courts, Criminal Law, Criminal Justice Operations, and Corrections and Community Reentry Committees, similarly highlighted that "the existing research casts doubt on the efficacy of these

---

review procedure" before accepting them (Sage Journals, Submission Guidelines, *available at* https://journals.sagepub.com/author-instructions/jrx [last accessed May 30, 2023]). The majority correctly points out that the study was based on self-reporting by sex offenders (*see* majority op at 12, n 8). The study's authors acknowledge this feature, but also note that other similar surveys had yielded similar results, "suggesting that sex offenders in various regions of the nation have similar experiences and perceptions" (Levenson & Hern, *supra*, 9 Just Res & Pol'y [No. 1] at 69).

Regarding the specifics of the study, the majority accurately observes that 19% of responding offenders agreed or strongly agreed to the statement that "[r]esidence restrictions help me to prevent offending" and 26% agreed or strongly agreed with the statement "I am more able to manage my risk factors because I cannot live near a school, park or playground" (Levenson & Hern, *supra*, 9 Just Res & Pol'y [No. 1] at 66). The majority disregards that several other responses displayed in that same table, including: the 45% of respondents who agreed or strongly agreed that "[housing restrictions make me feel hopeless, angry, and/or depressed[;]" another 45% who agreed or strongly agreed that "[b]ecause of housing restrictions, I live farther away from supportive family or friends[;]" 64% who agreed or strongly agreed with the statement "I worry that if I have to move, I will be unable to find a place to live[;]" and perhaps most significantly, 74% who agreed or strongly agreed with the statement "[i]f I really wanted to reoffend, I would be able to do so despite my residence restrictions" (*id.*).

These responses support the authors' overall conclusions, including that "[h]ousing restrictions appear to disrupt the stability of sex offenders by forcing them to relocate, sometimes multiple times, creating transience, financial hardship, and emotional volatility[,]" and that "sex offenders indicate that such regulations offer little value in preventing recidivism" (Levenson & Hern, *supra*, 9 Just Res & Pol'y [No. 1] at 67-68). Thus, the study confirms what others have observed: that residency restrictions may fail to achieve their goals and may increase recidivism (*see id.*).

restrictions" (City Bar Report, *supra* at 4). As the report explains, "laws preventing offenders from living near places where children congregate target only a small subsection of sex offenses" (*id.*). Furthermore, "[t]he vast majority of sexually motivated crimes are committed by a family member or someone else known to the victim" (*id.*, citing United States Department of Justice: Bureau of Justice Statistics, *Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident and Offender* [2000], *available at* http://www.bjs.gov/content/pub/pdf/saycrle.pdf [last accessed June 2, 2023]). The report continues, "persons who offend against family members or known victims rarely 'cross-over' and offend against strangers" (*id.*, citing, *inter alia*, Eric Beauregard, Benoit Leclerc, and Patrick Lussier, *Decision Making in the Crime Commission Process: Comparing Rapists, Child Molesters, and Victim-Crossover Sex Offenders*, 39 Criminal Justice and Behavior, 1275-1295 [2012]; Philip Firestone Firestone et al., *A Comparison of Incest Offenders Based on Victim Age*, 33 Journal of the American Academy of Psychiatry & Law, 223-232 [2005]).

Perhaps most disturbing is that the residency requirements may be having the opposite effect of what the legislature intended. According to the report, "studies suggest that residency restrictions do not reduce recidivism" even among offenders whose victims were strangers (*id.*, citing, *inter alia*, Beth M. Huebner et al., *An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri* [2013], *available at* https://www.ojp.gov/pdffiles1/nij/grants/242952.pdf [last accessed June 2, 2023]. And "[a]part from the questionable empirical basis for residency restrictions, there is widespread concern among experts that residency restrictions eliminate so many housing

options that they actually compromise public safety" (*id.* at 5, citing Mike Mosedale,

*Janus: No experts Support Residency Restrictions for Sex Offenders*, Minnesota Lawyer

[Mar 31, 2016], *available at* http://minnlawyer.com/2016/03/31/janus-no-experts-support-

residency-restrictions-for-sex-offenders/ [last accessed June 2, 2023]). SARA's residency

prohibitions erect "hurdles for successful reintegration into society and could even increase

recidivism" (*id.*, citing Jill S. Levenson & Leo P. Cotter, *The Impact of Sex Offender

Residence Restrictions: 1,000 Feet from Danger or One Step from Absurd*, 49 Int J

Offender Ther & Comp Criminology 168, 169 [2005]). Based on these data and findings,

the report concludes that "[i]deally, legislation around sexually motivated offenses should

serve both to promote public safety and rehabilitate offenders" and that "[l]aws that fail to

meet these goals, or that tend to undermine them, should be reconsidered" (*id.* at 6).[9]

Justice Sotomayor, drawing on this growing body of literature, caselaw relying on

empirical data to strike done residency requirements as patently ineffective, and

enforcement agencies' recognition of residency restrictions' counterproductivity, has

observed the following regarding our State's sex offender scheme:

> "No one doubts that New York's goal of preventing sexual violence toward
> children is legitimate and compelling, but New York nonetheless must
> advance that objective through rational means. Courts, law enforcement
> agencies, and scholars all have acknowledged that residency restrictions do
> not reduce recidivism and may actually increase the risk of reoffending. For
> example, in striking down retroactive application of Michigan's residency
> restriction, the Sixth Circuit found no evidence that 'residential restrictions
> have any beneficial effect on recidivism rates.' *Does #1–5 v. Snyder*, 834

---

[9] Specifically, the report recommends: (1) restoring SARA's original definition of "school grounds" which was limited to the real property line of schools; (2) eliminating SARA's mandatory nature; and (3) placing the burden on the prosecution to prove the necessity of imposing SARA's restrictions on each offender (*see* City Bar Report at 10-11).

F.3d 696, 705 (2016). The Superior Court of New Jersey, Appellate Division, struck down local ordinances establishing residential restrictions, concluding that they were pre-empted by state law. See *G. H. v. Township of Galloway*, 401 N.J.Super. 392, 951 A.2d 221 (2008), *aff'd*, 199 N.J. 135, 971 A.2d 401 (2009). The court explained that the local ordinances 'make it difficult for a [convicted sex offender] to find stable housing, which can cause loss of employment and financial distress, factors which inadvertently increase the chance of reoffense.' 401 N.J.Super., at 417, 951 A.2d at, 236.

Law enforcement agencies also recognize that residency restrictions are often counterproductive. The Department of Justice acknowledges that there is 'no empirical support for the effectiveness of residence restrictions' such as New York's. Office of Justice Programs, Sex Offender Management Assessment and Planning Initiative 205 (2017). In fact, the Department notes, residency restrictions may cause 'a number of negative unintended consequences' that 'aggravate rather than mitigate offender risk.' *Ibid.* An empirical study of recidivism conducted by the Minnesota Department of Corrections confirmed that 'none of the 224 sex offenses would likely ha[ve] been deterred by a residency restriction law.' G. Duwe, Residency Restrictions and Sex Offender Recidivism: Implications for Public Safety, 2 Geography & Pub. Safety 6, 7 (May 2009). Like the Department of Justice, the Minnesota Department of Corrections concluded that '[b]y making it more difficult for sex offenders to find suitable housing and successfully reintegrate into the community, residency restrictions may actually compromise public safety by fostering conditions that increase offenders' risk of reoffending.' *Id.* at 8.

A large body of scholarship also cautions against residency restrictions as a means of reducing recidivism. Criminologists considering data from Missouri and Michigan concluded that residency restrictions have little or no effect on recidivism. B. Huebner et al., The Effect and Implications of Sex Offender Residence Restrictions: Evidence From a Two-State Evaluation, 13 C. & Pub. Pol'y 139, 156 (2016). A similar study of recidivism rates in Florida reached the same conclusion. P. Zandbergen, J. Levenson, & T. Hart, Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism, 37 Crim. Justice & Behavior 482, 498 (2010) ('The results of this study indicate no empirical association between where a sex offender lives and whether he reoffends sexually against a minor'). Other scholars have explained that by banishing returning individuals to the margins of society, residency restrictions may lead to homelessness, unemployment, isolation, and other conditions associated with an increased risk of recidivism. See generally A. Frankel, Pushed Out and Locked In: The Catch-22 for New York's Disabled, Homeless Sex-Offender Registrants, 129

Yale L. J. Forum 279 (2019)" (*Ortiz*, 142 S Ct at 915-916 [Sotomayor, J., statement regarding denial of certiorari]).

The majority, nonetheless, ignores the data and exhortations from the bench and bar regarding the apparent failure of residency requirements to achieve their intended goals.[10] Worse yet, the majority seeks to avoid the issue altogether by reasoning that, because the Court previously rejected a substantive due process challenge to the law in *People ex rel. Johnson v Superintendent.*, *Adirondack Correctional Facility* (36 NY3d 187, 203 [2020]), it follows that the residency prohibition is rationally connected to public safety for ex post facto purposes (majority op at 11-12). This distressing syllogism exposes the majority's fundamental misunderstanding of a bedrock doctrine of federal constitutional law by wrongly equating rational-basis scrutiny in substantive due process cases like *Johnson* with the rational connection to a specific, non-punitive purpose the government must show for this law to survive petitioner's ex post facto challenge (*see Mendoza-Martinez*, 372 US at 169). As the *Johnson* Court itself noted, the former is " ' 'the most relaxed and tolerant form of judicial scrutiny' ' " (36 NY3d at 202, quoting *Myers v Schneiderman*, 30 NY3d 1, 15 [2017], quoting *Dallas v Stanglin*, 490 US 19, 26 [1989]). Under rational-basis review, government action "is entitled to a strong presumption of validity" and will be upheld if "it would serve legitimate state interests" (*Dobbs v Jackson*

---

[10] The majority and Judge Halligan candidly acknowledge these "troubling" findings (majority op at 14; Halligan, J., dissenting op at 8). Other courts have done the same. Contrary to Judge Halligan's suggestion that my views rest on "the absence of any counter to [the data] sufficient to resolve the question of whether SARA is excessive" (Halligan, J., dissenting op at 8), I conclude that this empirical evidence on its own undermines any rational connection between the statutory regulatory scheme and any nonpunitive purpose it was intended to serve.

*Womens Health Org.*, 142 S Ct 2228, 2284 [2022] [internal quotation marks omitted). An Ex Post Facto Clause analysis, by contrast, is much less deferential in that it focuses on whether the retroactively-applied law bears a "rational connection to a nonpunitive purpose" (*Smith*, 538 US at 102). The two are not the same—if they were the Supreme Court in *Smith* would have selected the same well-worn language from its substantive due process jurisprudence (*Hardware Dealers' Mut. Fire Ins. Co. of Wis. v Glidden Co.*, 284 US 151, 158-159 [1931] [to uphold a law against a substantive due process challenge, "it is enough that, when the statute is read in the light of circumstances generally known . . . , the possibility of a rational basis for the legislative judgment is not excluded"]).

In the ex post facto context, the law need not feature "a close or perfect fit with the nonpunitive aims it seeks to advance" and "[t]he excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy" (*id.* at 103, 105). But tolerance of some imprecision is not the functional equivalent of the deference courts afford the government under the lenient rational basis test. More importantly, for ex post facto purposes, the ultimate "question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective" (*id.* at 105). The fact that, under New York's scheme, any level 3 offender is subject to the residency prohibition—even someone, like petitioner, whose crime was against an adult and who has no history of harming or sexually obsessing over children—displays the clear

lack of a rational connection between the legislative stated intent of protecting children animating the residency prohibition and its actual, excessive effects.

Thus, even though this residency prohibition survived rational-basis review in *Johnson* (36 NY2d at 202-203), given its failure to achieve its regulatory goals, any rational connection between those goals and the effects on persons convicted before its enactment is, at best, tenuous and the scheme's effects on level 3 offenders like petitioner are excessive.

V.

> "Despite the empirical evidence, legislatures and agencies are often not receptive to the plight of people convicted of sex offenses and their struggles in returning to their communities. Nevertheless, the Constitution protects all people, and it prohibits the deprivation of liberty based solely on speculation and fear.
>
> When the political branches fall short in protecting these guarantees, the courts must step in" (*Ortiz*, 142 S Ct at 915-916 [Sotomayor, J., statement regarding denial of certiorari]).

The State's application of the regulatory scheme to those who committed their crimes before enactment of SORA and SARA results in additional incarceration and is otherwise so punitive in effect that it cannot be considered civil in nature. It is punishment, full stop. Given that courts alone can declare that a law violates the Ex Post Facto Clause, the majority has failed in its constitutional duty to step in and right this wrong.

I dissent.

HALLIGAN, J. (dissenting):

There can be no question that continued incarceration which results from applying the Sexual Assault Reform Act's (SARA) mandatory school residency restriction (Executive Law § 259-c [14]) to offenders who cannot identify SARA-compliant housing

- 1 -

is the "paradigmatic affirmative disability or restraint" (*Smith v Doe*, 538 US 84, 100 [2003]). While that impact should surely be taken into account in determining whether SARA is punitive for purposes of the Ex Post Facto Clause, I am not persuaded that the United States Supreme Court's decision in *Seling v Young* (531 US 250 [2001]) allows us to focus our analysis exclusively on that group of offenders. As the majority points out, we do not know how many individuals have been, or likely will be, subject to prolonged incarceration due to SARA's residency restriction.[1] If that group were exceedingly small in number as compared with the total number of offenders subject to SARA, this case might closely resemble *Seling*, which barred an Ex Post Facto challenge to the actual conditions of confinement imposed on a single individual.

I nonetheless dissent because I do not believe the majority sufficiently grapples with whether mounting evidence that SARA-type restrictions have no beneficial impact on public safety (or worse yet, may be deleterious) renders SARA's retroactive application excessive and thus violative of the Ex Post Facto Clause. As the majority explains, even if the legislature intended SARA to be civil in nature, sufficiently punitive purpose or effect can negate the legislature's intent for Ex Post Facto purposes. Analyzing whether a statute is punitive in effect requires consideration of "the statute's proportionality to its

---

[1] At oral argument, counsel from the Attorney General's office noted that, "[a]s of May 1st, there were approximately forty-six people either in a RTF or at DOCCS waiting for New York City SARA-compl[ia]nt housing" (Tr. of Oral Arg. at 21:7-21:9). Counsel for the Department of Corrections and Community Supervision (DOCCS) previously stated that there were 295 people awaiting SARA compliant housing and that the average waiting time for placement in a SARA-compliant shelter was approximately two to three years (*see People ex rel. Johnson v Superintendent, Adirondack Corr. Facility*, 174 AD3d 992, 996-997 [3rd Dept. 2019] [Garry, P.J. concurring]).

nonpunitive purpose" (majority op at 14; *see Hudson v United States*, 522 US 93, 101 [characterizing excessiveness factor of intent-effects test as proportionality inquiry]).

Critically, the Appellate Division appeared to believe its analysis of this question was "constrained" by our decision in *People ex rel. Johnson v Superintendent, Adirondack Corr. Facility* (36 NY3d 187 [2020]) (*see* 200 AD3d 1370, 1374 [3d Dept 2021]). In *Johnson*, we held that confinement in correctional facilities of those awaiting SARA-compliant housing did not violate the federal substantive due process rights of the individual petitioners or impose cruel and unusual punishment in violation of the Eighth Amendment. But the Ex Post Facto Clause asks whether the challenged statute imposes punishment at all, not whether a legislative measure is rationally related to a conceivably legitimate state interest or inflicts cruel and unusual punishment.

I agree with the majority that *Johnson* effectively resolves the question of whether there is a rational connection between the school residency restriction and the purpose of protecting children. But *Johnson* does not answer the distinct question of the statute's excessiveness (or as the majority puts it, its proportionality) in light of that purpose (*see* majority op at 15). Given the significant potential implications of the question presented here for both offenders subject to SARA and for public safety, I would remit to the Appellate Division so that it could fully consider this question in the first instance (*see People v Johnson*, 39 NY3d 92, 98 [2022] [reversing and remitting to the Appellate Division to conduct factual and legal review under the proper framework]).[2]

---

[2] I also note that in assessing whether SARA imposes an affirmative restraint, the majority discounts SARA's impact because the restriction applies only during parole, conditional

SARA's purpose of protecting children is certainly essential.  SARA also imposes significant burdens, both on those who manage to secure SARA-compliant housing and especially on those who cannot.  That leaves the question of how effectively SARA furthers its goal.  No matter how crucial a statute's purpose, the legislative means chosen can be deemed unreasonable or disproportionate if they do little or nothing to advance the legislature's objective.

Petitioner asserts, albeit only glancingly, that there is no empirical evidence demonstrating that SARA's restrictions in fact work to protect children from high-risk sex offenders, and that credible evidence indicates the restrictions may even exacerbate the risk of sexual recidivism against children.  Petitioner points us to a Justice Department report concluding that "there is no empirical support for the effectiveness of residence restrictions," and that "a number of negative unintended consequences have been empirically identified" (United States Department of Justice, Office of Justice Programs, *Sex Offender Management Assessment and Planning Initiative* at 205 [2017]); an article reaching the same conclusion (Ira M. Ellman, *When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry*, 7 U Pa J L & Pub Affairs 1 [2021]); a federal appellate decision that acknowledged the absence of evidence

---

release, or postrelease supervision (*see* majority op at 9-10).  While an individual's liberty interest may indeed be diminished during those periods, that point weighs more significantly in a substantive due process inquiry than an Ex Post Facto challenge (*see Weaver v Graham*, 450 US 24, 29-30 [1981] ["Evaluating whether a right has vested is important for claims under the . . . Due Process Clause(), which solely protect(s) pre-existing entitlements. The presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition"] [citations omitted]).

that "residential restrictions have any beneficial effect on recidivism rates" in finding

Michigan's sex offender statute excessive (*Does #1-5 v Snyder*, 834 F3d 696, 705 [6th Cir

2016]); a state high court decision concluding that the efficacy of the same statutory

scheme was, at a minimum, unclear (*see People v Betts*, 507 Mich 527, 561, 968 NW2d

497, 514 [2021]);[3] and Justice Sotomayor's similar observations in a statement regarding

denial of certiorari from this Court's decision in *Johnson* (*see Ortiz v Breslin*, 142 S Ct 914

[2022] [Sotomayor, J., statement]).  Additionally, the dissent references an empirical study

of sex offender recidivism cited in petitioner's habeas petition (*see* Jill S. Levenson &

Andrea L. Hern, Sex Offender Residence Restrictions: Unintended Consequences and

Community Reentry, 9 Just Res & Pol'y [No. 1] 59, 61 [June 2007]) and a New York City

Bar report highlighting empirical doubt about SARA's efficacy (*see* New York City Bar

Association, *The Impact and Legality of Sex Offender Residency Restrictions Created by*

*New York's Sexual Assault Reform Act* [Oct. 2016]).  Similar concerns are raised by an

---

[3] Petitioner cites a number of other cases invalidating sex offender residency restrictions as, among other reasons, excessive (*see Starkey v Oklahoma Dept. of Corr.*, 2013 OK 43, 305 P3d 1004 [2013] [invalidating Oklahoma residency restriction]; *Commonwealth v Baker*, 295 SW3d 437 [Ky 2009] [invalidating Kentucky residency restriction]; *State v Pollard*, 908 NE2d 1145 [Ind 2009] [invalidating Indiana residency restriction as ex post facto punishment on state constitutional grounds]; *see also Evenstad v. City of W. St. Paul*, 306 FSupp3d 1086 [D Minn 2018] [granting preliminary injunction barring enforcement of Minnesota residency restriction]; *Does v Wasden*, 982 F3d 784 [9th Cir 2020] [holding challengers of Idaho residency restriction had plausibly alleged ex post facto violation]; *Doe v Miami-Dade County, Fla.*, 846 F3d 1180 [11th Cir 2017] [same for Florida residency restriction]; *but see McGuire v Marshall*, 50 F4th 986, 1009 [11th Cir 2022] [upholding Alabama residency restriction]; *Hope v Commr. of Indiana Dept. of Correction*, 9 F4th 513 [7th Cir 2021] [upholding Indiana residency restriction]; *Vasquez v Foxx*, 895 F3d 515 [7th Cir 2018] [upholding Illinois residency restriction]; *Doe v Miller*, 405 F3d 700 [8th Cir 2005] [upholding Iowa residency restriction]).

Advisory Committee on Criminal Law and Procedure convened by New York's Chief Administrative Judge (*see* Residency Restrictions for Certain Sex Offenders, 2017 Rep of Advisory Comm on Crim Law and Pro to Chief Admin Judge of Cts of St of NY at 29-30).

With respect to the empirical question of whether SARA's restriction furthers its intended purpose, the majority fairly asks whether the record here is sufficiently robust to assess its efficacy. (To the extent the majority suggests that we must simply defer to the legislature on this question, I disagree. Both cases the majority cites, *A. E. Nettleton Co. v Diamond*, 27 NY2d 182 [1970] and *White v Cuomo*, 38 NY3d 209 [2022], involve other constitutional provisions. The purpose of the Ex Post Facto Clause is to guard against arbitrary or vindictive legislation that may be directed against a disfavored group [*see Miller v Florida*, 482 US 423, 429 (1987)], making total deference to the legislature inappropriate.) But it is striking that the Attorney General offers no response to the empirical assertion—now accepted by several other courts—that a school residency restriction does not in fact reduce sexual recidivism against children and may actually have a harmful effect in deterring these serious crimes.

The majority brushes aside the decisions invalidating similar residency restrictions on the ground that the statutes in those other jurisdictions are different. It is true that the residency restrictions at issue in those cases were tied to the offender's underlying conviction, without regard to whether the victim was a minor or any individualized risk assessment, and appear to apply beyond the end of an offender's sentence (*see Does #1-5*, 834 F3d 696; *Betts*, 507 Mich 527; *Starkey v Oklahoma Dept. of Corr.*, 2013 OK 43, 305 P3d 1004 [2013]; *Commonwealth v Baker*, 295 SW3d 437 [Ky 2009]). In that respect,

SARA can be described as more carefully tailored to the goal of identifying those who pose the greatest risk to children. But those statutes appear to be less burdensome than SARA in that they do not appear to require that an offender secure compliant housing before being released, and for that reason, those courts did not consider the potential prolonged incarceration that results under New York's law.

Beyond the question of how closely SARA resembles other residency restrictions that have been found to violate the Ex Post Facto Clause, the two cases relied on by petitioner raise serious questions about whether school restrictions actually reduce sexual recidivism against children. The Sixth Circuit's ruling invalidating Michigan's school restriction (as well as that state's registration and notification requirements) rested on a voluminous record that included expert testimony, data regarding the total number of offenders by each risk level, and a map showing which property parcels in a particular city were off-limits to registrants (*see Does #1-5 v. Snyder*, 101 F Supp 3d 672 [ED Mich 2015], ECF 90-95). The Michigan Supreme Court had before it an amicus brief that presented numerous empirical studies indicating that there are relatively low recidivism rates among sex offenders—including as reported by New York's Department of Corrections and Community Supervision (DOCCS) (*see* Friend of the Court Brief Submitted in Support of Defendant-Appellant in *People v Betts*, 507 Mich 527 [2021], available at 2020 WL 4261609, *10); that residency restrictions do not reduce sex offender recidivism (*see id.* at *29); and that the collateral consequences of sex offender residency restrictions for former offenders, their families, and the community undermine public safety (*see id.* at *34-42).

Like my dissenting colleagues, I find this evidence deeply troubling. One might find the absence of any counter to it sufficient to resolve the question of whether SARA is excessive, as Judge Rivera's dissent does: any measure that does nothing to promote a desired goal while imposing significant burdens is arguably excessive and out of proportion by definition. But these issues were not well-aired before this Court, and given the importance of the question, I am not prepared at this juncture to hold that SARA has punitive effect and thus violates the Ex Post Facto Clause. Instead, I would clarify that this question is not controlled by our decision in *People ex rel. Johnson* and remit so that the Appellate Division may fully consider whether SARA's school residency restriction is excessive in relation to its nonpunitive purpose (*see People v Johnson*, 39 NY3d 92, 98 [2022] [reversing and remitting to the Appellate Division, absent request from either party, to conduct factual and legal review under the proper framework]). I respectfully dissent.

Order insofar as appealed from affirmed, without costs. Opinion by Judge Singas. Judges Garcia, Cannataro and Troutman concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs. Judge Halligan dissents in a separate opinion.

Decided June 15, 2023